**COMMERCIAL FEDERAL CORP.,**
**and Commercial Federal Bank,**
**FSB, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 94–599C.

United States Court of Federal Claims.

March 18, 2003.

Jerry Stouck, Washington, D.C., attorney for plaintiffs. Rosemary Stewart, Washington, D.C., of counsel.

Renée Brooker,[1] Washington, D.C., with whom were David W. Ogden, Acting Assistant Attorney General, David M. Cohen, Director, for defendant. Susan F. Lamarca, Washington, D.C., of counsel.

## OPINION & ORDER

BUSH, Judge.

This case is presently before the court on plaintiffs' motion for summary judgment on liability for breach of contract and defendant's cross-motion for summary judgment and opposition to plaintiffs' motion for partial summary judgment. It is one of approximately 120 cases brought in the United States Court of Federal Claims in the early to mid–1990's by savings and loan institutions seeking damages allegedly caused by the enactment and enforcement of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989) (FIRREA). FIRREA changed the regulatory minimum capital requirements and mandated that thrifts were no longer allowed to count goodwill toward their capital requirement, contrary to the government's promises in certain cases to individual banks that it would not do so during the terms provided by their agreements to acquire failing thrift institutions. The background of the history and circumstances surrounding the thrift crisis of the early 1980's; these cases; and FIRREA is discussed in detail in the Supreme Court's decision in *United States v. Winstar Corp.*, 518 U.S. 839, 843–861, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (*Winstar III*).

This case involves Commercial Federal Corporation's (Commercial Federal; ComFed) unassisted acquisition of two thrifts, Empire Savings, Building, and Loan (Empire Savings; Empire) and Territory Savings and Loan Association (Territory), in 1987 and 1988, respectively. That the transactions at issue are "unassisted" means that the government did not provide cash assistance for Commercial Federal to acquire the thrifts, and the acquisitions took place without a formal assistance agreement or a supervisory action agreement. Plaintiffs contend that with respect to the 1987 acquisition of Empire, the Federal Home Loan Bank Board (FHLBB)[2] promised that $190 million of

1. As of April 24, 2001, *Maureen Delaney*, Washington, D.C., with whom were *Stuart E. Schiffer*, Deputy Assistant Attorney General, *David M. Cohen*, Director, for defendant. *Daniel D. McLain*

and *William G. Kanellis*, Washington, D.C., of counsel.

2. The FHLBB was responsible for regulating all federally-insured savings associations, also

goodwill (the amount by which Empire's liabilities exceeded its assets)[3] would "count" as regulatory capital and would be amortized in accordance with generally accepted accounting principles (GAAP), and $60 million of preferred stock issued to enable Commercial Federal to obtain the cash necessary to acquire Empire would also be included as regulatory capital. Plaintiffs contend that absent these two government commitments, Commercial Federal would have failed its own regulatory capital requirement by a wide margin on the day the acquisition closed.

Commercial Federal's 1988 acquisition of the savings deposits of Territory Savings was the result of a formal "bid" process undertaken by the FSLIC. Commercial Federal offered to accept a five-year, $20 million promissory note from the FSLIC as part of the FSLIC's payment for Commercial's assumption of Territory's savings deposits. FSLIC accepted that offer, and issued a letter to Commercial Federal confirming that "for regulatory accounting purposes, Commercial Federal could book the promissory note as a direct addition to its regulatory capital." Pl. Ex. T.[4]

The government's position is essentially that: (1) it is necessary to review each transaction on a case by case basis; (2) Commercial Federal entered into these transactions for reasons of business expansion; and (3) none of the contracts or agreements in dispute were breached by FIRREA. The factual background and procedural history of these transactions is discussed in detail *infra*.

For the reasons set forth below, plaintiffs' motion for summary judgment is denied insofar as it seeks to establish liability for the Empire acquisition and granted insofar as it seeks to establish liability for the Territory acquisition. Correspondingly, defendant's cross-motion for summary judgment is granted insofar as it argues against a finding of liability with respect to the Empire acquisition and denied insofar as it argues against a finding of liability with respect to the Territory acquisition.

## BACKGROUND

### I. Procedural history

ComFed filed its complaint on September 13, 1994. ComFed asserts that the enactment of FIRREA breached its alleged contracts by requiring it to discontinue and/or phase out goodwill from the calculation of the thrift's regulatory capital, and disallowing ComFed from counting its preferred stock and a $20 million promissory note toward the thrift's regulatory capital requirements. In counts two through eight of its complaint, ComFed alleges claims of frustration of purpose, mutual mistake, unjust enrichment, takings of its contract rights, and violations of the Due Process Clause.

The United States answered on December 9, 1994, before the court stayed the case on February 2, 1995, pending an opinion from the Court of Appeals for the Federal Circuit sitting *en banc* in *Winstar v. United States*. After the Supreme Court rendered its decision in *Winstar III*, the court adopted special case management procedures that applied to each of the approximately 120 *Winstar*-related cases, and transferred all the cases to then-Chief Judge Smith. Under these case management procedures, twelve cases were

known as "thrift" institutions. *See* 12 U.S.C. § 1461. The FHLBB's insurance arm, the Federal Savings & Loan Insurance Corporation (FSLIC) was responsible for insuring the qualifying savings accounts of all such institutions. *See* 12 U.S.C. § 1724 *et seq.*

**3.** Goodwill represents the difference in value between the troubled thrift's assets and its liabilities, i.e., the amount by which the troubled thrift was insolvent on a mark-to-market basis at the time of the transaction. *Winstar Corp. v. United States*, 64 F.3d 1531, 1536 (Fed.Cir.1995) (*Winstar II*). A mark-to-market valuation evaluates the net worth of a company under the prevailing

market conditions and assets are valued in accordance with market price rather than at book value. *LaSalle Talman Bank FSB v. United States*, 45 Fed.Cl. 64, 71 n. 3 (1999), *aff'd in part, vacated in part on other grounds by LaSalle Talman Bank FSB v. United States*, 317 F.3d 1363 (Fed.Cir.2003).

**4.** Pl.Ex. refers to exhibits appearing in the appendix to plaintiffs' March 25, 1998 motion for summary judgment on liability for breach of contract. Further, Pl.Ex. *at* a given page number refers to a specific page number, whereas Pl.Ex. [K, 18] refers to a specifically designated exhibit.

designated as "priority cases," and the remaining cases were apportioned into three "waves."

ComFed was placed into the first wave of approximately thirty cases. On March 25, 1998, ComFed filed a motion for summary judgment on liability for breach of contract, along with its appendix and proposed findings of uncontroverted fact. The government requested an enlargement of time for its response until after the completion of fact discovery, and filed its opposition and cross-motion with appendix on September 14, 1999, along with its statement of genuine issues and proposed findings of uncontroverted fact. Also on this date, defendant filed its motion to dismiss counts two through eight of ComFed's complaint. The court, however, stayed briefing on ComFed's non-contract claims. On November 15, 1999, defendant filed its initial list of potential liability issues remaining to be decided. On December 7, 1999, plaintiffs filed their statement of genuine issues and proposed findings of uncontroverted fact as to relevant matters not covered by the defendant's proposed findings (as corrected). On December 7, 1999, plaintiffs filed their reply to defendant's opposition to plaintiffs' motion for partial summary judgment and opposition to defendant's cross-motion for summary judgment (as corrected). Also on this date, plaintiffs filed their supplemental appendix of exhibits in support of their motion for summary judgment and in opposition to defendant's cross-motion for summary judgment (corrected copy). On January 5, 2000, defendant filed its reply to plaintiffs' opposition to defendant's cross-motion for summary judgment.

On February 11, 2000, defendant filed its opposition to plaintiffs' motion for leave to file a surreply on liability. On June 20, 2000, then-Chief Judge Loren A. Smith issued an order granting plaintiffs' motion for leave to file a surreply on liability, filed January 14, 2000. Accordingly, plaintiffs' surreply on liability was filed on June 20, 2000.

In accordance with this court's order dated April 12, 2002, on May 14, 2002 plaintiffs filed their supplemental brief addressing the impact of the Federal Circuit's decision in *California Federal Bank, FSB v. United States*, 245 F.3d 1342 (Fed.Cir.2001) (*CalFed II*), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002). Also, pursuant to the court's order dated April 12, 2002, defendant filed its supplemental brief on liability regarding *CalFed II* in support of defendant's cross-motion for summary judgment on May 14, 2002. The court held oral argument on the cross-motions for summary judgment for liability for breach of contract on September 30, 2002.

Also included in the materials before the court on liability, are the following notices of supplemental authority: (1) Defendant's notice of filing of motion for leave to file supplemental authority with the court filed on August 17, 1998, granted September 23, 2002 and defendant's response thereto filed July 24, 2002; (2) Plaintiffs' motion for leave to notify the court of recent authority: *Fifth Third* and *Hegewisch* filed July 17, 2002, granted September 23, 2002; (3) Defendant's motion for leave to file notice of supplemental authority filed September 17, 2002, granted September 26, 2002 and plaintiffs' response thereto, filed September 24, 2002; (4) Plaintiffs' notice of additional supplemental authority filed September 24, 2002 and defendant's response thereto, filed October 21, 2002; (5) Plaintiffs' notice of supplemental authority, filed by leave on October 30, 2002 and defendant's response thereto, filed October 30, 2002; (6) Plaintiffs' notice of supplemental authority, filed December 13, 2002, and defendant's response thereto, filed as an attachment to its November 22, 2002 motion to strike; and (7) Plaintiffs' notice of supplemental authority filed March 6, 2003 and defendant's response thereto filed March 5, 2003.

Pursuant to this court's October 3, 2002 order, on October 21, 2002, plaintiffs filed their supplemental submission regarding contract documents and appendix thereto and their supplemental brief on the authority of FHLBB principal supervisory agents (PSAs) to enter into *Winstar*-related contracts. On October 30, 2002, defendant moved to strike Commercial Federal's supplemental submission re: its contract documents. On November 5, 2002, this court held a telephonic status conference regarding

defendant's motion to strike in which the parties participated. Also on this date, the court issued an order wherein it denied defendant's motion to strike plaintiffs' supplemental submission and granted defendant's alternative request to respond to plaintiffs' supplemental submission re: its contract documents. Accordingly, defendant filed its response to plaintiff Commercial Federal's supplemental submission re: contract documents on November 18, 2002.

Fact discovery in this case began on April 1, 1998 and ended in July 1999. After fact discovery, the parties entered into expert discovery on ComFed's damages theories. ComFed claims damages under expectancy and reliance theories, as well as for restitutionary relief. The government denies that ComFed has suffered damages under any of these theories. Expert discovery is now complete; but on April 6, 2002 and June 29, 2002, the government filed motions to preclude ComFed's introduction of new opinions from its expert-designee. ComFed opposed the government's motions, and the court has suspended decisions on these motions until it makes a liability determination.

## II. *Detailed factual recitation and parties' positions*

### A. *The Empire transaction*

#### 1. *The documents and events constituting the alleged offer*

##### a. *Early negotiations and events*

Because, as the parties agree, Commercial Federal's 1987 acquisition of Empire Savings was "unassisted," there is no formal assistance agreement signed by the government and Commercial Federal. Thus, given the detailed and complex nature of the transactions at issue in this case, it is necessary for this court to undertake a thorough examination of this transaction and the documentation to "confirm" whether a contract exists between the parties. *See CalFed II*, 245 F.3d at 1347. Plaintiffs in this matter have identified the specific contract documents

that they assert constitute the alleged contract in this matter. The government's general response is that these documents cannot be considered part of any alleged contract formation as they only constitute required regulatory approval of ComFed's acquisition of Empire.

ComFed contends that it was specifically urged to enter into agreements with the FHLBB and FSLIC relative to certain thrift acquisition transactions. Pl. Mot. at 5.[5] Specifically, the affidavit of William A. Fitzgerald, Chairman of the Board and Chief Executive Officer (CEO) of Commercial Federal Corporation, states that he was solicited and encouraged (in multiple conversations and meetings, including a major meeting in Kansas City) by officials from the Federal Home Loan Bank of Topeka (FHLBank of Topeka), who wished to have Commercial Federal assist them with the acquisition of financially-troubled or failing thrifts. Mr. Fitzgerald admits that Kermit Mowbray, the FHLBB's Principal Supervisory Agent (PSA) at the FHLBank of Topeka, never promised ComFed it would receive any special regulatory treatment in connection with the purchase of Empire. Def.App. at 512 (Fitzgerald Deposition I, 200–210).[6] Most of these conversations were allegedly conducted between Kermit Mowbray and Mr. Fitzgerald. The parties agree that Mr. Mowbray has since become incapacitated and is unable to be deposed, submit an affidavit, or testify in this matter. Commercial Federal contends that at the time the FHLBB was encouraging it to assist with the acquisition of troubled or failing thrifts, Commercial Federal was a financially healthy thrift that consistently satisfied its regulatory capital requirements. In fact, contend plaintiffs, Commercial Federal's stability was precisely why the government sought it out as a merger partner for failing thrifts that threatened FSLIC's deposit insurance fund resources.

Prior to Mr. Fitzgerald's first alleged contact from Mr. Mowbray about acquiring trou-

---

**5.** Pl. Mot. refers to plaintiffs' motion for summary judgment filed March 25, 1998.

**6.** Def.App. refers to defendant's appendix submitted in support of its September 14, 1999 cross-motion for summary judgment on liability for breach of contract.

bled thrifts, Commercial Federal had acquired a number of small thrifts within its home state of Nebraska. During the early-to-mid 1980's, thrifts generally were prohibited from operating interstate, and could operate across state lines only through the acquisition of troubled thrifts in another state. In approximately late 1985, Commercial Federal was again considering the acquisition of another small thrift within Nebraska. However, Mr. Mowbray apparently advised Mr. Fitzgerald at that time that Commercial Federal would not be permitted to acquire another in-state Nebraska thrift. Thus, in order to pursue its expansion plans, Commercial Federal would have to acquire troubled institutions in other states.

Mr. Fitzgerald states that at the meeting in Kansas City, the government representatives stated that all well-capitalized and well-managed thrift institutions were being asked to assist the FHLBB and FSLIC by acquiring troubled and failing thrifts. He contends that the speakers stated that the FHLBB was particularly interested in locating institutions or investors which would acquire troubled thrifts without direct financial assistance from the FSLIC. The government representatives, including FHLBank officials, allegedly stated that other incentives could be used to make such acquisitions attractive. These incentives included the use of purchase accounting in which the goodwill and other intangibles that arose from an acquisition could be counted as regulatory capital, which could be amortized over a lengthy period of time. Mr. Fitzgerald states that sometime shortly after the meeting in Kansas City, Mr. Mowbray again reminded him that Commercial Federal was expected to "help" the FHLBB and FHLBank of Topeka with its problems in the 10th District. According to plaintiffs, Mr. Mowbray then specifically suggested that Commercial Federal "take a look" at Empire Savings in Colorado, which Mr. Mowbray stated he knew to be looking for a merger partner. Mr. Fitzgerald states that as a direct result of this conversation, and with the knowledge that such an out-of-state merger with a troubled thrift would be the only way that Commercial Federal could grow by acquisition, Commercial Federal began negotiations to acquire Empire Savings in 1986. The only documentation in the record supporting Commercial Federal's account of Mr. Mowbray's alleged suggestion is the Fitzgerald affidavit. Mr. Fitzgerald further contends that as a result of the above-described encouragement from the FHLBank of Topeka, between 1986 and 1988, Commercial Federal also acquired all or part of troubled thrifts in each of the other states (outside Nebraska) within the FHLBB's 10th District (i.e., in Colorado, Kansas and Oklahoma).

The government portrays a starkly different picture of how and why Commercial Federal developed the idea of purchasing Empire. The government contends that by 1984, ComFed had all but exhausted its ability to grow and acquire branches in Nebraska. According to the government, ComFed's management believed that ComFed's stock would earn a "premium" or experience a higher "multiplier" if ComFed were a multi-state thrift, rather than a thrift operating solely in Nebraska. Def. Mot. at 6.[7] By mid–1985, however, ComFed was restricted by state laws against interstate branching from growing its deposits by establishing branches, or even acquiring existing thrifts, in the states nearest to ComFed. Then, in 1985, a new FHLBB policy went into effect that permitted the acquisition of thrifts from the FSLIC by out-of-state acquirers, thus permitting the acquirer to gain access to interstate branching rights.

The government contends that ComFed was in the process of meeting with potential acquisition targets that ComFed considered to be healthy. It states that ComFed intended to identify and begin discussions with healthy thrifts in a particular state before it began its bid to acquire smaller thrifts from the FSLIC. The government points out that in contrast to these negotiations, there was a standard process to follow in order to acquire a thrift, or the deposits of a thrift, from the FSLIC. Therein, ComFed would either receive notification from the FHLBank of Topeka or the FHLBB that a particular thrift was up for bid, or ComFed, itself,

---

7. Def. Mot. refers to defendant's cross-motion for summary judgment filed September 14, 1999.

might contact the FHLBank of Topeka to inquire about current bidding opportunities in a particular state. Then, if interested, as an initial step, ComFed would receive a "due diligence" package from the FHLBank of Topeka. All due diligence would be supplied by the FHLBank of Topeka or the FHLBB, which tended to provide the best available information.

The government contends that ComFed's goal in Colorado was to obtain a healthy thrift, but in order to do so it had to acquire a thrift from the FSLIC. The defendant points out that plaintiffs submitted a bid to the FSLIC to acquire Sierra Federal Savings & Loan Association, in another transaction not at issue here, so it could then go after a "healthy institution" in Colorado. Sierra provided ComFed with "access to a state with a potential market of 1.1 million households." Def. Mot. at 12 (quoting Def.App. at 508, 222 (Fitzgerald I, 171; DX–151, 3)).

The government indicates that ComFed was interested in pursuing Empire because of its strong presence in the community. The government contends that Mr. Fitzgerald first "called on Empire" in the early part of 1985, and that Fitzgerald viewed these early negotiations as "courting" the thrift. Def. Mot. at 14 (quoting Def.App. at 510 (Fitzgerald I, 179)). The government states that Commercial Federal's Chief Financial Officer, Gene Boba, believed from his meetings with Mr. Mowbray that Empire's asset portfolio was of good quality and that the FHLBank of Topeka was "very comfortable with their underwriting criteria." Def.App. at 479 (Boba I, 54). Mr. Fitzgerald met with Jim Carpenter, the Chairman of the Board of Empire, and Gene Ross, the President of Empire, on more than one occasion to negotiate a potential acquisition. The early negotiations were, however, unsuccessful.

ComFed then paid $50,000 to Barbara Turner, an investment banker with Shearson Lehman Brothers (Shearson), to assist in its attempt to acquire a healthy thrift. Shearson identified seven thrifts for ComFed's consideration. Empire was among the list of these thrifts. Barbara Turner assisted ComFed with the successful acquisition of Empire, and was paid a fee of 1% of the acquisi-

tion. ComFed paid Shearson $450,000 for its services with regard to the Empire acquisition.

Ultimately, ComFed decided to attempt to acquire Empire. Empire, itself, had also retained an investment banking firm, Goldman Sachs, to assist in locating a willing and able merger partner. Def.App. at 343–45 (Ex. 14 of 10/30/86 Application at 1–3). Thus, Goldman was also negotiating, on behalf of Empire, with other potential purchasers. According to Mr. Fitzgerald, the negotiations for the acquisition of Empire were long and drawn-out. Def.App. at 511 (Fitzgerald I, 188). Mr. Fitzgerald and the senior management at ComFed arrived at a general price range within which to negotiate with Empire and approved the start of negotiations. On September 12, 1986, Shearson provided the fairness opinion to ComFed in accordance with the terms of the engagement. According to the opinion rendered, the $45 million price negotiated between ComFed and Empire was a "fair price." Def.App. at 315, 341–42.

### b. *The stock purchase agreement*

On September 12, 1986, ComFed entered into the stock purchase agreement with Empire, in which ComFed agreed to pay Baldwin Enterprises, Inc. (Baldwin), Empire's sole shareholder, $45 million for all of the issued and outstanding permanent capital stock of Empire. The stock purchase agreement contained representations and warranties by Empire and Baldwin about the condition of Empire, and a clause permitting ComFed to back out of the contract prior to closing if ComFed found "material adverse changes" to the condition of Empire that deviated from Empire's disclosure. Def. App. at 30–31, 56–59, 466, 467, 528 (DX–2, 11–12, 37–40; Volin 25, 36–37; Fitzgerald II, 476). This agreement was conditioned on the FHLBB's agreement to the transaction "without the imposition of conditions ... which are materially burdensome." Pl. Mot. at 10 (quoting Pl.Ex. C at 31). Thus, Commercial Federal alleges it "retained the express right to walk away from the transaction if it could not reach an acceptable agreement with the FHLBB concerning reg-

ulatory capital (or other) terms." Pl. Mot. at 10.

Defendant points out that the stock purchase agreement cannot be a contract document between plaintiffs and the government because it is a privately negotiated agreement between ComFed, Baldwin, and Empire, in which the government played no role whatsoever. The United States also contends that although the agreement did contain a standard clause which states that if the conditions for approval of the merger were too burdensome, then ComFed could walk away from the deal; nowhere in the agreement does ComFed condition the purchase of Empire on any special treatment of goodwill by the government or any agreement with the government whatsoever. Defendant further notes that the purchase does not reflect an agreement on the part of the government regarding purchase accounting, as the relevant regulations required that the mergers including goodwill be accounted for according to GAAP. 12 C.F.R. § 563.22(e)(1)(xii) (1987). Thus, the government states that ComFed was required to use purchase accounting in accordance with GAAP in this transaction. *See* discussion in n. 7 of Def. Cont. Doc. Brief.[8]

Defendant states that several employees of ComFed visited with Empire, its management and employees, prior to ComFed's entry into the stock purchase agreement, and continued to do so after the agreement was signed until closing. An initial review of Empire's financials, its assets and liabilities, including its loan failures and its securities portfolio, was completed in the summer of 1986.

The government points out that the stock purchase agreement was included with ComFed's application materials because regulatory approval was necessary for ComFed to purchase the stock of Empire from Baldwin. *See* 12 U.S.C. § 1730(a) (1987) and 12 C.F.R. § 563.22(a) (1987).

#### c. *The application*

Plaintiffs contend that the contract documentation here confirms the parties' express agreement to the necessary regulatory accounting terms. Plaintiffs contend that their written application to acquire Empire Savings, submitted to the FHLBB and FHLBank of Topeka on October 30, 1986, constitutes an offer that contains the key terms about purchase accounting and regulatory capital. Pl. Mot. at 8–9 (citing Pl.Ex. A, B). This application allegedly followed active encouragement by the FHLBB for Commercial Federal to acquire all or part of troubled financial institutions. The application undisputedly followed negotiations and an acquisition contract between Commercial Federal and the prior owner of Empire Savings.

Plaintiffs contend that this "offer" was accepted by the FHLBB's written approval of the application. Plaintiffs further contend that the passages in the application that are relevant to this case are as follows:

(1) The application states that the "proposed accounting procedure" to be followed by Commercial Federal was described in the 10/30/86 letter of an independent accounting firm, Touche Ross, which is one of the attachments to Commercial Federal's 10/30/86 application. The letter states that goodwill would result from the proposed acquisition and that the "purchase method" of accounting would be used to calculate the goodwill and its amortization period "in accordance with generally accepted accounting principles." Pl.Ex. B. This accountant's letter was based on the review by Commercial Federal's independent accounting firm of the proposed accounting details set forth in the pro forma financial statements that also accompanied Commercial Federal's 10/30/86 application. Pl. Cont. Ex. 18; Pl. Cont. Ex. A at 10 ¶ (g).[9]

(2) Commercial Federal's 10/30/86 application advised the FHLBB that the hold-

---

8. Def. Cont. Doc. Brief refers to defendant's response to plaintiff Commercial Federal's supplemental submission re: contract documents filed November 18, 2002.

9. Pl. Cont. Ex. refers to the appendix of exhibits related to plaintiff Commercial Federal's supplemental submission re: its contract documents filed October 21, 2002.

ing company would need to raise additional equity capital at the time of the acquisition (in order to ensure that the combined institution would meet its capital requirements) and that it would infuse all such new capital into Commercial Federal Bank. Pl.Ex. A (cover letter at 2, and Sec. I at 2, 4–5).

(3) In the 10/30/86 cover letter to the application, Commercial Federal's counsel explained why its application could be approved under authority delegated to the FHLBank of Topeka by the FHLBB. Pl.Ex. A, cover letter at 2.

(4) Commercial Federal's 10/30/86 application noted increased amounts of "scheduled items" and "delinquent loans" at Empire as well as increased loan loss reserves established by Empire throughout 1986. The "adverse conditions" in the Colorado economy also were highlighted, and Commercial Federal stated that it could not predict the ultimate result of Empire's adverse trends "although such delinquencies and reserves adversely affected [Empire's] net worth and income from operations." Pl.Ex. A at 17, 21–22; Pl. Cont. Ex. at 24, 28–29.

In further support of their argument that a contract existed between plaintiffs and the defendant, plaintiffs point to the pro forma financial statements as of 6/30/86, which were attached to the 10/30/86 application. These statements were considered by Touche Ross in its drafting of the accountant's letter discussed *supra.* According to plaintiffs, these statements show that the goodwill projected to result from Commercial Federal's acquisition of Empire as of 6/30/86 was $80 million and the "core value of deposits"—another intangible asset—was then projected to be $27.8 million. Pl. Cont. Ex. 18 at 1–2.[10]

Plaintiffs further contend that in the negotiations that followed Commercial Federal's submission of its application to acquire Empire, the government clearly manifested its understanding that its agreement to regulatory capital treatment for the goodwill and other intangibles arising under the purchase method of accounting, as proposed in the application, was necessary in order for the acquisition of Empire to be financially feasible and for Commercial Federal to remain in regulatory capital compliance after the acquisition.

In stark contrast to plaintiffs' position, the government contends that the 10/30/86 application constitutes a "necessary regulatory step," and does not reflect an intent to contract on the parties' part. It points out that by statute, no insured thrift could acquire or merge with another insured thrift without the approval of the FHLBB. 12 U.S.C. § 1730(a) (1987) and 12 C.F.R. § 563.22(a) (1987). The FHLBB required submission of an application in order to approve a merger, and policy guidelines governed whether such application would be approved. The form of the application, including the specific information necessary for regulatory approval, was established by regulation, and forms were printed by the FHLBB. In fact, ComFed's counsel, Leonard Volin, who was in charge of preparing and submitting the application, testified that the application was "required by law," as one "cannot close a merger or acquisition, at least of a banking company, without getting the specific approval of the applicable banking agency." Def. Mot. at 18 (citing Def.App. at 466 (Volin 23–24)).

Similarly, with respect to the financial information submitted with the application, "there were instructions as far as what type of financial information to provide as part of the application." Def. Mot. at 19 (citing Def. App. at 468 (Volin 49)). Also, the government, with regard to the pro forma financials and accountant's letter discussed in paragraph (1) above, contends that it is not uncommon for goodwill to be generated when one thrift purchases another, and that the

---

**10.** This pro forma statement indicated a 10–year amortization period for the goodwill, and did not indicate, as plaintiffs contend in their complaint, that Commercial Federal intended to amortize the resulting goodwill over 25 years. Also, it states that the goodwill from the Empire transac-
tion was $69,647 million, which is reduced to $55,364 million after eliminations and write offs. The government also points out the core deposit intangibles is a red herring and a means of "padding" damages that was never asserted as part of ComFed's alleged contract.

submission of an accountant's opinion stating that the transaction would be accounted for in accordance with GAAP was standard. Title 12 C.F.R. § 563.22(e)(1)(xii) (1987) reflects this as it states that "[w]here goodwill has been included in the resulting institution's assets, the applicant must submit an opinion of a certified public accountant, satisfactory to the Principal Supervisory Agent, that its use and value are appropriate under, and accounted for by, generally accepted accounting principles." *See also* 12 C.F.R. § 571.5(e) (1987) (stating: "Accounting for goodwill. The proposed treatment of goodwill in connection with the merger must be fully described in the application. The computation and amortization of goodwill should be in accordance with accounting policies of the Board in effect at the time the application is filed"). Accordingly, contends the defendant, ComFed cannot morph the accountant's letter and pro forma into a contract document.

Regarding ComFed's statement in paragraph (2) of relevant application passages, the government contends that this information was included because it was required pursuant to 12 C.F.R. § 563.22(e)(1)(xii) (1987). Section 563.22(e)(1)(xii) states:

Merger application ... shall be deemed to be approved automatically ... unless: The resulting association's ... regulatory capital would not at least equal the amount required under the Board's regulatory capital requirements.

As plaintiffs indicate in paragraph (3) above, the multi-volume application, including the supporting materials, was enclosed by a letter from counsel that requested approval by the PSA of the FHLBank of Topeka, pursuant to delegated authority. The letter affirmed that the regulatory conditions for delegated authority had been met, including the opinion that "the application may be processed by the Principal Supervisory Agent under delegated authority .... This opinion is based upon the fact[ ] that ... the application does not appear to raise any significant issue of law or policy." Pl.Ex. A, cover letter at 2. The government further contends that the cover letter to the application was necessary to comply with the regulatory require-

ments for an application to be processed under delegated authority. 12 C.F.R. § 574.6(b)(1) (1987). The defendant further states that nowhere in the application, or the supporting materials, did ComFed describe any particular supervisory issues regarding Empire raised by, or to be addressed through, the proposed transaction.

As set forth in paragraph (4) above, plaintiffs state that the application noted increased amounts of scheduled items and delinquent loans at Empire as well as increased loan loss reserves established by Empire throughout 1986, and adverse conditions in the Colorado economy. In response, defendant replies that this information is simply part of the application process whereby ComFed was required to address each item on the FHLBB's form. Specifically, the statements were in response to Item 10 of the application requiring "Financial Condition and Operations" information and Item 12 entitled "Future Prospects of the Applicants, its Subsidiaries and the Surviving Institution." The government also notes that ComFed devoted a full paragraph examining how "[t]he future prospects of both Commercial and Empire will be enhanced by the proposed acquisition." Def. Cont. Doc. Brief at 6 (quoting Pl. Cont. Ex. at 29). The defendant further points out that 12 C.F.R. § 563.22(e)(1)(xii) (1987) states that "in calculating whether the regulatory capital of the resulting institution will at least equal the amount required under § 563.13(b), the Principal Supervisory Agent may exclude scheduled items which will be acquired in the merger, and so there is nothing unusual about the FHLBB or a PSA being aware of scheduled items."

#### d. *Request for additional information*

Shortly after receipt of Commercial Federal's application, in November 1986, the FHLBB sent a request for additional information, as ComFed's application was not considered complete as initially filed. In this letter, FHLBB requested that Commercial Federal "provide a statement of condition of the combined entities as of September 30, 1986," and "provide evidence that the result-

ing institution will be able to meet its net worth [i.e., regulatory capital] requirement under the regulations that go into effect January 1, 1987." Pl.Ex. D. Marcia Boswell–Carney, an employee of the FHLBank of Topeka, states in her affidavit that she "routinely sent such letters in connection with applications." Def.App. at 4. Plaintiffs contend that "[t]his request evidences government knowledge that Commercial Federal was proposing to acquire a thrift that, when combined with Commercial Federal, would possibly have difficulty meeting the government's net worth or capital requirements." Pl. Cont. Doc. Brief at 7.[11] ComFed states that "[s]uch a request would not have been made to two healthy thrifts that propose to merge on their own." *Id.*

In response to the request for additional information, in December, 1986, ComFed submitted Amendment No. 1 to its application to acquire Empire. This amendment included additional pro forma financial projections demonstrating that the combined institution would comfortably exceed the applicable regulatory capital requirements—assuming that the combined institution could and would continue to include the purchase accounting intangibles in its regulatory net worth. Had the goodwill and other intangibles resulting from use or purchase method accounting for the acquisition been deducted from regulatory capital at any time during the period covered by the projections submitted by Commercial Federal with Amendment No. 1 to its application, then the combined institution would have failed its regulatory capital requirement. Pl. Mot. at 12–13 (citing Fitzgerald Affidavit at ¶¶ 20–21). The government argues that although the FHLBank of Topeka staff reviewed the entire submission, including the projected impact on earnings of goodwill amortization (goodwill of $20 million was projected), there was nothing in the financials presented that described any potential problems for the resulting institution in meeting its capital requirements. Def. Mot. at 22 (citing Def.App. at 6, 137–45 (Boswell–Carney Decl. ¶ 3; DX–74)). The govern-

ment also points out there was no conditional language in the application or supporting documentation saying anything to the effect that "Commercial Federal would exceed the minimum net worth requirements over the next three years, but only assuming that it used GAAP and 'counted' in regulatory capital both the goodwill and the $60 million of new capital it proposed to raise at the same time it acquired Empire."

### e. *Health of Empire*

Although the parties agree that Empire was not listed on any "troubled," or insolvent thrift list of the FSLIC or the FHLBB, they disagree over the actual financial condition of Empire. Plaintiffs contend that Empire was in a "troubled financial condition" which is described throughout Mr. Fitzgerald's Affidavit, Pl. Cont. Ex. at 360–71, and in the deposition transcripts previously submitted to the court from Mr. Fitzgerald and from Commercial Federal's Chief Financial Officer (CFO) Gene Boba. *See* Comm. Fed. 12/07/99 Reply at 5–6 and n. 5, 15–17 and n. 13, 24–27 and Supp.App. Ex.'s 1 and 2 attached thereto. Plaintiffs also contend that Empire's financial condition is demonstrated, in detail, in Supplemental Appendix Exhibits 1, 2, 6, 7, 8, 9, 10, 11 and 19 attached to the Com. Fed. 12/07/99 Reply. Plaintiffs contend that the question of Empire's troubled financial condition is relevant to the consideration exchanged by the parties.

The government, however, asserts that, in this case, there was no consideration or mutual intent because in part, unlike in other cases, Empire was not a troubled thrift. So the consideration for this alleged contract cannot be, as plaintiffs contend, that they "agreed to take the financially troubled Empire Savings off the hands of the government." Def. Cont. Doc. Brief at 15. It argues that none of ComFed's application materials, or even the amendments subsequently filed, contain any information that would lead the FHLBB to believe that Empire was failing. The pro forma combined balance sheet that ComFed submitted with

---

11. Pl. Cont. Doc. Brief refers to plaintiff Commercial Federal's supplemental submission re:

contract documents filed October 21, 2002.

this application showed that Empire had positive stockholders' equity of $69.7 million. When ComFed filed Amendment No. 1 to its application, the financial information regarding Empire remained the same. *See* Def. App. at 348–57. The government further states that when ComFed filed Amendment No. 2, no new financial information was provided regarding Empire. *Compare* Def.App. at 289 (pro forma submitted with original application) *with* Def.App. at 366 (pro forma submitted with Amendment No. 2). The only change to the original pro forma was an additional line item for the $60 million preferred stock issuance. Def.App. at 366. Empire still had positive stockholders' equity of $69.7 million.

In reviewing applications for regulatory approval of mergers and acquisitions, FHLBank of Topeka staff prepared summary descriptions, or "digests," of the transactions as presented by the applicants, which typically became the basis for recommending approval or disapproval of an application. The digest prepared by Ms. Boswell–Carney for ComFed's application describes both ComFed and Empire as large thrifts, each with middle-of-the-road ratings in their most recent FHLBank of Topeka exams.

The FHLBank of Topeka staff reviewed ComFed's application and the supporting materials to determine whether the transaction described appeared likely to adversely impact the financial condition of the resulting institution. The FHLBank of Topeka staff understood that ComFed had determined it would raise the capital to pay the $45 million purchase price through a common stock offering. Based upon the application, including the fairness opinions from Shearson regarding the purchase price, according to the government, it appeared that ComFed and Empire had completed adequate research and the necessary due diligence to complete the large transaction.

Plaintiffs note that had they believed that the government, following the merger, could impose new regulatory capital requirements (for example, a change in goodwill account-

ing) that would force the institution out of capital compliance, Commercial Federal would have had to disclose that possibility in response to the government's request for assurances about regulatory capital compliance following the Empire acquisition. According to defendant, however, ComFed never considered accounting for the Empire transaction in any manner other than in accordance with generally acceptable accounting principles. *See* discussion *supra*; 12 C.F.R. § 563.22(e)(1)(xii) (1987).

### f. *ComFed's due diligence of Empire Savings*

According to the government, between the signing of the stock purchase agreement in September 1986 and the closing on April 30, 1987, ComFed spent a significant amount of time and employed approximately 20 people to conduct due diligence [12] on-site at Empire. Business market concerns arose among ComFed executives, including a perceived decline in the Colorado economy and in Empire's real estate loans and joint ventures. Def. Mot. at 26 (citing Def.App. at 440, 460A, 481A (Grieb I, 194–95; Gunter, 137–38; Boba I, 90–91)). Moreover, there was, according to the government, some internal disagreement at ComFed as to whether to proceed with the transaction. Some of the decisionmakers at ComFed began to have second thoughts about whether to consummate the transaction. ComFed then attempted to renegotiate the purchase price, but Baldwin would not accept anything less than $45 million. The government contends ComFed believed that Empire was a good long-term investment and therefore made "a lot of economic sense." *Id.* at 27 (quoting Def.App. at 517 (Fitzgerald I, 243)). According to Mr. Fitzgerald, the "go/no go decision" culminated in a "come to Jesus meeting" among senior management in the last two weeks prior to closing. *Id.* (citing Def.App. at 519 (Fitzgerald I, 251)). Mr. Grieb recommended to Mr. Fitzgerald that ComFed proceed with the acquisition. The government states that Mr. Fitzgerald, himself, never

---

**12.** Due diligence is defined as a prospective buyer's or broker's investigation and analysis of a target company, a piece of property, or a newly issued security. Black's Law Dictionary, 468 (7th Ed.1999).

considered backing out of the deal; as he was "convinced it was the right thing to do," and believed the ComFed had the experience to manage and handle the declining assets. Def. Mot. at 27 (citing Def.App. at 517–18 (Fitzgerald I, 249, 245)).

### g. *Period prior to closing—alleged representation*

ComFed alleges that during the period prior to closing of the Empire acquisition, as Empire's financial condition deteriorated, Commercial Federal's CEO inquired of Kermit Mowbray whether it might revise its proposed acquisition and receive financial assistance from the FSLIC. According to plaintiffs, Kermit Mowbray, the Principal Supervisory Agent for the FHLBank of Topeka, strongly encouraged Commercial Federal to continue with the transaction and specifically acknowledged that the "consideration" that Commercial Federal would receive for the acquisition would be the favorable accounting treatment for the "goodwill" that arose from the transaction. Pl. Mot. at 13 (citing Fitzgerald Affidavit at ¶¶ 22–24).

### h. *Sale of stock*

Plaintiffs state that at the time of the Empire acquisition, Commercial Federal, even with the use of purchase accounting and resulting regulatory capital treatment of goodwill and other intangibles, did not have sufficient capital resources to complete the Empire acquisition or to satisfy its own regulatory capital requirements after taking on Empire's capital deficiency. Therefore, plaintiffs contend that from the outset they knew that in order to complete the acquisition they would have to raise additional equity or debt that could qualify as regulatory capital. Thus, Commercial Federal's application to acquire Empire made it clear that, in order to complete the acquisition, Commercial Federal would have to raise additional capital of approximately $60 million, which also would have to be included in Commercial Federal's regulatory capital.

Although initially Commercial Federal contemplated raising this additional $60 million through the sale of common stock, over time it determined to raise the capital by selling preferred stock. Specifically, in the January 16, 1987 Amendment No. 2 to Commercial Federal's application, plaintiffs advised the FHLBB that Commercial Federal would be issuing $60 million of preferred stock as part of the proposed acquisition of Empire Savings rather than the common stock projected in its 10/30/86 application. Plaintiffs did this because issuing preferred stock as opposed to common stock would change some of the financial information provided in the application and Amendment No. 1. Also on this date, Commercial Federal advised the FHLBB that it would soon be filing an application for approval to include the preferred stock as regulatory capital. Pursuant to Section 563.7–5 of the Insurance of Accounts Regulations, ComFed had to obtain the written approval of the FHLBB prior to issuing the preferred stock.

The government contends that ComFed determined to issue preferred stock, rather than common, in order to be assured more readily of raising the entire $60 million of capital, and to do so more cheaply by selling to one purchaser rather than through an investment banker. Gene Boba, ComFed's CFO, determined that the amount of capital that needed to be raised was approximately $60 million, which was arrived at by multiplying Empire's asset base, $2 billion, by the then-current regulatory capital requirement of three percent. Def.App. at 483–84, 228 (Boba I, 152–53; DX–165; 2). The proposed purchaser was a financial subsidiary of El Paso Electric Corporation, PasoTex. The government points out that there is no evidence that ComFed ever suggested to PasoTex that Empire was a troubled thrift. Def. Cont. Doc. Brief at 17–18.

Significantly, the government contends that the January 30, 1987 cover letter simply reiterated the exact language of the applicable regulations, which allowed for the ability to include stock proceeds as regulatory capital and merely reflects ComFed's compliance with regulatory requirements. *See* Section 563.7–5(a) for mandatorily redeemable preferred stock, stating that: "No insured institution shall issue mandatorily redeemable preferred stock includable in regulatory capital pursuant to this section or amend the

terms of such preferred stock unless it has obtained the written approval of the Corporation." Def.App. at 727. The government contends that the transaction, as such, clearly does not reflect any "bargained-for" exchange between ComFed and the government, as the documentation here consists of nothing more than standard regulatory submissions that were mandatory for this type of preferred stock issuance. The government states that there is no evidence of ComFed requesting anything that is not otherwise allowable under or pursuant to the regulations.

### 2. *The alleged acceptance*

#### a. *The FHLBB's conditional acceptance letter*

In January, 1987, the FHLBB expressly agreed to the transaction terms set forth in Commercial Federal's application (as amended) to acquire Empire Savings and to merge it into Commercial Federal. The FHLBB's acceptance of the transaction terms was contained in a letter dated January 16, 1987, from Mr. Mowbray, the FHLBB's PSA at the FHLBank of Topeka. The FHLBB acceptance letter specifically stated that it was issued "pursuant to the delegated authority conferred per Federal Regulation [12 C.F.R. § ]584.4 and Insurance Regulation [12 C.F.R. § ]563.22." Pl.Ex. F.

The FHLBB's acceptance letter also set forth eight numbered "conditions" to the acquisition approval, with compliance by Commercial Federal requested within a specific time period. The government contends that each of the conditions set forth in the letter were either required by statute or regulation, or were determined by the FHLBank of Topeka as likely to have a significant impact on the resulting institution's ability to remain in compliance with regulations.

#### (1) *The preferred stock conditions*

One of the "conditions" set out in the FHLBB's January 16, 1987, acceptance letter related to the sale of preferred stock of Commercial Federal. The proceeds of that preferred stock sale were to provide additional, necessary capital to Commercial Fed-

eral in connection with its acquisition of Empire. *See* discussion *supra*. The FHLBB's "condition" states that the sale of the preferred stock "must occur prior to, or simultaneously with," Commercial Federal's acquisition of Empire Savings. Pl.Ex. F. Condition 2; Pl.Ex. L.

On January 30, 1987, Commercial Federal applied to the FHLBB pursuant to Section 563.7–5 of the Insurance Regulations to issue $60 million of preferred stock and to include the proceeds of the sale as regulatory capital. The cover letter states "we are submitting herewith one signed and three copies of Commercial Federal's Application for approval to Issue Preferred Stock and include the proceeds of same as regulatory net worth pursuant to Section 563.7–5 of the Insurance of Accounts Regulations." Pl.Ex. J. at 1. This application was conditionally approved, under delegated authority, by three FHLBB officials in Washington, D.C. on April 15, 1987. Pl.Ex. L. The approval letter states that Commercial Federal "is hereby granted the written approval of the [FSLIC] to include in its regulatory net worth ... an amount equal to the proceeds of the sale of $60 million ... [of] Preferred Stock...." *Id.* The government contends that this letter mirrors the verbiage of the regulation, and approves exactly what the regulation allows (that the proceeds of the $60 million preferred stock issuance could be utilized in its regulatory net worth). Pl. Cont. Ex. at 161–62. The government points out that this was a standard regulatory approval letter, and any thrift seeking to issue this type of preferred stock, irrespective of whether the issuance was in conjunction with an acquisition, would have been required to apply pursuant to Section 563.7–5 of the Insurance of Accounts Regulations and would have received the same ability to include the proceeds in its regulatory net worth.

ComFed's sale of the preferred stock took place on April 27, 1987 after receiving all necessary approvals to the sale. In a letter dated 6/5/87, FHLBB Supervisory Agent Douglas W. Pittman acknowledged that the separate set of conditions imposed by Exhibit L had been met relative to Commercial Federal's "issuance and inclusion in regulatory

capital" of its new $60 million of preferred stock. Pl. Cont. Ex. M at 163. That same week, on April 30, 1987, Commercial Federal acquired the stock of Empire Savings, and, on May 1, 1987, Empire was merged into Commercial Federal.

### (2) *The accountant's statement condition*

The FHLBB's January 16, 1997 acceptance letter also required that Commercial Federal send to the FHLBB Supervisory Agent in Topeka:

(c) A statement of financial condition of the applicant and the association as of the effective date of the acquisition and merger, including footnotes on purchase accounting and an accountant's statement certifying that the use of purchase accounting is in accordance with GAAP.

Pl.Ex. F, Condition 6(c).

Commercial Federal contends that in the context of the overall transaction and the other documents showing the parties' contractual intent, this letter represents the FHLBB's "acceptance" of Commercial Federal's "offer" to utilize purchase accounting pursuant to GAAP in both calculating and recording the goodwill and other intangibles created by the Empire acquisition and amortizing them in accordance with GAAP. Commercial Federal complied with this condition by providing the FHLBB with (1) its preliminary "purchase accounting" unaudited pro forma combined balance sheet as of the April 30, 1987 effective date of the merger, which sets forth the results of Commercial Federal's mark-to-market analysis of Empire, indicating the specific adjustments made utilizing the purchase method of accounting, and (2) the corresponding letter of its independent accountant (Touche Ross & Co.) about that accounting, dated July 8, 1987.[13] Page 1 of the financial information reports that goodwill had risen to $145.7 million and the intan-

gible asset "core value of deposits" had risen to $50.8 million. The accountant's letter states that the "purchase method" of accounting had been utilized, including amortization of resulting goodwill in accordance with "generally accepted accounting principles." Pl. Cont. Ex. G. at 1. Also, Commercial Federal later provided the FHLBB and the SEC with its June 30, 1987 fiscal year-end audited statement of financial condition, which included the results of the acquisition of Empire Savings, stating that "[t]his acquisition has been accounted for as a purchase" and summarized how the purchase accounting had been recorded. Pl. Cont. Ex. H at 123. It included footnotes on purchase accounting for the Empire acquisition and a letter from Touche Ross certifying that the statements were "in conformity with GAAP applied on a consistent basis." Pl.Ex. H at 19–42. .

Plaintiffs contend the FHLBB accepted these materials as complying with the "accountant's statement" condition because in July 1987 the FHLBB specifically advised that "the material submitted as evidence of compliance with the requirements set forth in the January 16, 1987 letter from the Principal Supervisory Agent ... fulfills the conditions of approval." Pl. Mot. at 17 (quoting Pl.Ex. I). *See infra.*

Far from considering this condition and plaintiffs' satisfaction thereof as evidence of a contract, the government contends that, as even Mr. Volin, the attorney for ComFed who submitted these applications acknowledged, the condition requiring an accountant's opinion describing that the transaction had been accounted for in accordance with GAAP "was a standard condition in any of these approval letters." Def.App. at 473 (Volin 115). "[The FHLBank of Topeka] wanted to see financial statements and a letter from the accountant saying that the application, in this case purchase accounting, was proper." *Id.* The government contends that ComFed

---

**13.** Under purchase accounting, the mark-to-market analysis (in which all assets and liabilities of the acquired company are "marked" up or down to their fair market value) is done as of the date of the acquisition (here, April 30, 1987) even though it takes some time to actually perform the analysis once the acquisition is done. *See Wins-*

*tar III,* 518 U.S. at 848–49, 116 S.Ct. at 2442 (explaining the "critical aspect" of the purchase method of accounting was that it permitted the acquiring entity to record goodwill after determining the fair values of what had been acquired).

was required by regulation to use GAAP and submit the accountant's letter. *See* 12 C.F.R. § 563.22(e)(1)(xii) (1987). *See* discussion *supra.*

### (3) *Restricted dividend policy condition*

A third condition required the holding company, Commercial Federal Corporation, to stipulate that it would agree to a restricted dividend policy and would cause the regulatory capital of Commercial Federal Bank to be maintained consistent with FHLBB regulatory requirements, specifically Section 563.13(b) of the Rules and Regulations for Insurance of Accounts, and, if necessary, the holding company would infuse additional capital to keep the institution in compliance. Commercial Federal Corporation agreed to accept a restricted dividend policy and pledged to maintain the regulatory capital of its subsidiary thrift following its acquisition of Empire. Plaintiffs contend that Commercial Federal Corporation would never have issued this stipulation absent an understanding that the government had promised to count both the goodwill and the $60 million of preferred stock as regulatory capital. Plaintiffs contend that to have provided that stipulation, absent the government's commitment to the agreed regulatory capital terms, would have risked subjecting Commercial Federal Corporation to a potentially unending need for subsequent capital infusions. The government contends, however, that Commercial Federal Corporation was required by regulation to ensure that the resulting institution would satisfy the regulatory net worth requirements and infuse capital if necessary. *See* 12 C.F.R. § 574.8(a)(1)(iv)(A) (1987) (stating that: "Where the acquirer is a company ... [i]t will ensure that its subsidiary insured institution shall have, at the end of each calendar quarter, regulatory capital at least equal to the amount that may be required pursuant to § 563.13 of this Chapter").

### b. *Completion of the transaction*

On May 1, 1987, Commercial Federal notified the government by letter that its acquisition of Empire Savings' stock had been con-summated on April 30, 1987 and the merger of Empire into Commercial Federal occurred the following day on May 1, 1987. With this letter, Commercial Federal's counsel also submitted most of the documents required to satisfy the conditions set forth in the FHLBB's 1/16/87 conditional approval, including: (1) a copy of the Form 8–K, describing the financial statements; and (2) pro forma financial information and exhibits, prepared as a notice of the purchase of Empire and merger into ComFed. Defendant points out that in a letter submitted on May 1, 1987 the CEOs of ComFed and Empire certified that as of April 30, 1987 (after the alleged contract), "no material adverse change has occurred with respect to the condition or operations of [the CEO's institution] since the date of the financial statements submitted with the application for approval of this transaction." Def. Cont. Doc. Brief at 17 (quoting Pl. Cont. Ex. at 327–38). On July 14, 1987, Commercial Federal sent its remaining compliance materials to the FHLBB. Correspondence contained in this exhibit explains that the FHLBank of Topeka had extended the due dates for submission of this compliance material so that Commercial Federal could file the information at the same time with the FHLBB and the SEC. Pl. Cont. Ex. 21 at 330, 349–55.

### c. *FHLBB's acknowledgment of satisfaction of conditions of approval*

In a letter of July 22, 1987, FHLBB Supervisory Agent William M. Humenczuk stated that the materials sent to the FHLBB regarding evidence of compliance with the requirements set forth in the January 16, 1987 letter were reviewed by the FHLBB and found satisfactory to "fulfill the conditions of approval" as "set forth in the January 16, 1987 letter." Pl.Ex. I.

### 3. *The purchase accounting and regulatory capital calculations*

#### a. *Plaintiffs' arguments*

Plaintiffs state that a principal inducement for Commercial Federal's agreement with the FHLBB relative to its acquisition of Empire Savings was the government's agreement that, for regulatory capital purposes,

goodwill and other intangibles arising in the merger would be recognized as regulatory capital and amortized consistent with GAAP. The actual amount of goodwill and other intangibles could not, however, be ascertained until the assets and liabilities of Empire Savings were reviewed and marked-to-market upon the completion of the acquisition. Upon consummation of the merger and completion of the purchase-accounting calculations, both Commercial Federal and its independent accountants reported the results to the FHLBB and FHLBank of Topeka. In particular, contend plaintiffs, the goodwill resulting from Commercial Federal's acquisition of Empire Savings was reported to be $139,332,000 in amount, and it was reported that this amount would be amortized consistent with GAAP for up to 25 years. Pl. Mot. at 18 (citing Pl.Ex. H at 32).[14] In addition, another $50,812,000 was recorded as a distinct intangible asset, i.e., the core value of Empire's deposits, which was to be amortized consistent with GAAP on a straight-line basis over 15 years. Pl.Ex. G.

The amortization schedules and calculations for the goodwill and other intangibles that resulted from the Empire acquisition also were made available to the FHLBB's examiners. The FHLBB's 1987 report of examination of Commercial Federal, commenced shortly after the Empire acquisition, reported that the institution's "Net Other Assets" included the goodwill and other intangibles attributable to the acquisition of Empire. Pl. Mot. at 18 (citing Pl.Ex. N at A–4 to A–6). The same FHLBB report also noted that $60 million of regulatory capital resulted from Commercial Federal's sale of the preferred stock in connection with this acquisition of Empire.

Plaintiffs argue it would have been "madness" for it to undertake the Empire Savings acquisition without the government's assurances about regulatory accounting treatment, because immediately following the acquisition in 1987, Commercial Federal would not have been in compliance with the FHLBB's regulatory capital requirements if (1) it could not have included in its regulatory capital and

amortized in accordance with GAAP the $190 million of goodwill as well as include in its regulatory capital other intangibles arising from the acquisition of Empire Savings (the amount by which Empire's liabilities to depositors and others exceeded the fair market values of its tangible assets); and (2) if it could not have included in its regulatory capital the $60 million of preferred stock issued to facilitate the acquisition. Pl. Mot. at 7; 18–19.

Plaintiffs cite to *Winstar III* and argue that, "[i]t would have been madness" for Commercial Federal "to have entered in th[is] transaction[ ]" in the absence of the government's regulatory capital commitments. Pl. Mot. at 8 (quoting *Winstar III*, 518 U.S. at 910, 116 S.Ct. at 2472). Plaintiffs argue that as in *Winstar*, the principal inducement for Commercial Federal to acquire Empire Savings was the government's agreement concerning a particular accounting treatment. *See Winstar III*, 518 U.S. at 848, 116 S.Ct. at 2442 (recognizing that "the principal inducement for these supervisory mergers was an understanding that the acquisitions would be subject to a particular accounting treatment that would help the acquiring institutions meet their reserve capital requirements imposed by federal regulations"). *See also* discussion *infra*. In fact, argue plaintiffs, Commercial Federal would have been effectively insolvent and its very existence would have been in jeopardy had these items been excluded from its regulatory capital during the acquisition. Plaintiffs allege this is demonstrated by the audited annual financial report submitted by Commercial Federal for year-end 6/30/87. Pl. Mot. at 19 (citing Pl.Ex. H at 20, 39). At that time, Commercial Federal's regulatory capital requirement was approximately $161.5 million and its actual regulatory net worth—including both the goodwill and other intangibles and the preferred stock relating to the Empire transaction—was approximately $219 million. Pl. Mot. at 19 (citing Pl.Ex. H at 39). Deducting those two items (which totaled about $250 million) would

---

14. As an aside, the court notes that the document to which plaintiffs cite in support of this contention is *Commercial Federal Corporation's Annual Report*.

have caused Commercial Federal to have *negative* regulatory capital. *Id.*

### b. *Government's arguments*

By contrast, the government traces the history of the transaction and contends that the purchase accounting for the acquisition was uncertain and constantly shifting. It states that the transaction, as accounted for by ComFed upon completion, varied significantly from what was initially described to ComFed's board of directors, and that the year-long evolution of ComFed's internal financial accounting began with its initial due diligence in July 1986, and culminated in ComFed's purchase accounting adjustments set forth in its July 1987 Form 8–K filing with the SEC.

In support of this theory, the government points out that based on the original due diligence conducted in June and July of 1986, ComFed made an initial determination of the value of Empire to ComFed. *See* discussion of due diligence *infra.* Based on its valuation of Empire prior to entering into the purchase agreement, ComFed's management prepared a report to its board of directors recommending entry into the purchase agreement at a price of about $45 million. In the board report, ComFed's senior management noted that "[f]or accounting purposes, the assets and liabilities of Empire will be purchased for their fair value plus an amount in excess of value which would be treated as goodwill." Def. Mot. at 29 (citing Def.App. at 228 (DX–165)). The board report described assumptions used in the financial presentation, including the raising of an additional $60 million in capital in order to support the then-current regulatory capital requirement of three percent of assets. *Id.* Future increases in regulatory capital, as required, were projected to be met through future earnings. *Id.* at 29–30. There was no mention of any regulatory treatment of the goodwill, contractual or otherwise. Def. Mot. at 30.

ComFed's management initially projected goodwill from the Empire transaction of approximately $45 million. Def.App. at 233. The projections stated that the goodwill would be amortized over 25 years, under the "straight line" method. *Id.* ComFed's management also estimated values for identified intangible assets, including core value of deposits and purchase mortgage servicing rights. *Id.* Nowhere in the board report was any mention made of any agreement with any government agency or official regarding regulatory capital. However, ComFed's management description of the recommended stock purchase agreement set forth an express recognition contained in the disclosure statements: "Buyer acknowledges an understanding of future regulatory changes." Def. App. at 244.

By the time ComFed submitted pro forma financials as of June 30, 1986, with its application to the FHLBB to acquire Empire, the purchase accounting adjustment had changed. The estimate for goodwill had increased to $55.4 million, from the earlier estimate of $45 million. Def. Mot. at 30 (citing Def.App. at 88 (DX–10 at PCM001 0361)). The period of amortization for goodwill was reduced to ten years from the prior estimate of 25 years, but the method (either straight-line, or level yield) was not described. *Id.* Other intangibles decreased; for instance, the estimate of the core value of deposits was reduced to $27.8 million from the earlier estimate in the board report of $42.7 million. Def. Mot at 30 (citing Def. App. at 88, 233 (DX–165, 7)).

During the interim period, ComFed had continued to perform due diligence; however, the reports from the field did not change earlier dollar values assigned as likely purchase accounting adjustments. Def. Mot. at 30–31 (citing Def.App. at 211–12 (DX–118)) (Oct. 30, 1986 memo. continues to recommend $8 to $12 million write down of joint venture property). Moreover, although ComFed supplemented the financial information it provided to the FHLBB and the FHLBank of Topeka on two different occasions (Amendments Nos. 1 and 2), it never revised the purchase accounting estimates contained in its original submissions with its application.

Ultimately, in July 1987, ComFed determined that it would record goodwill of $126,416,000 as a result of its acquisition of Empire. Def.App. at 270 (DX–223 at

PCM059 1599). According to ComFed's Form 8–K filing with the SEC, a copy of which was submitted to the FHLBank of Topeka, the goodwill figure reflected the total amount of goodwill established as a consequence of the Empire acquisition, less the $12.9 million in goodwill which had been carried by Empire on its books. *Id.* At this point, the period of amortization also changed, from the prior ten-year period to fifteen years. Although the projections did not state the method of amortization, a separate letter from ComFed's auditors dated July 8, 1987 stated that goodwill would be amortized "over the shorter period of a period no greater than the estimated remaining life of the long-term interest-bearing assets acquired or 25 years ... in accordance with generally accepted accounting principles." Def. Mot. at 31 (citing Def.App. at 116 (DX–26)). In the Fitzgerald affidavit, plaintiffs' CEO claims a 30 year and then, several pages later, a 20 year period of amortization. Def.App. at 583, 583A (Fitzgerald I at 223, 241).

In March 1989, Mr. Fitzgerald sent a letter to Danny Wall, then-chairman of the FHLBB. In that letter, Mr. Fitzgerald states that after acquiring Empire, it became "quite clear that the balance sheet of Empire seriously understated the true condition of the Association and, in fact, ComFed had effectively taken over a FHLBB/FSLIC problem institution," and that the "FSLIC at some point in time, likely would have paid some type of assistance package." Def.App. at 293 (DX–343). On this basis, Mr. Fitzgerald requested an "exemption" from the proposed changes to the treatment of regulatory capital, which he considered to be equivalent to a " 'change of rules' during the game." *Id.*

### B. *Territory acquisition*

In early 1988, the FHLBB solicited bids for the savings deposits of Territory. Territory was a seriously insolvent thrift that the FHLBB intended to place into receivership with the FSLIC. By letter dated January 22, 1988, Commercial Federal bid to acquire from the FSLIC the insured deposits of Territory as well as certain of its real and personal property at a "discount." Pl.Ex. O. In the first of two alternative bids set out in that letter, Commercial Federal offered to accept a five-year promissory note from the FSLIC for $20 million as part of the FSLIC's payment for Commercial Federal's assumption for the savings deposits of Territory. *Id.* This bid included a "discount" from the balance of the deposits acquired (the deposit balance was estimated to be about $67 million) of 7.526 percent. *Id.* The bid requested payment for the total value of the deposits, less the discount (or "purchase price") in the form of a five-year promissory note from FSLIC carrying an interest rate described as 227 basis points above the average six-month Treasury Bill rate. *Id.* Significantly, the bid letter specified, "[i]n addition, Commercial Federal is asking that the FSLIC consider the five-year note ... as regulatory net worth for purposes of reporting to the FHLBB." *Id.* According to the FSLIC bid package, the FSLIC promissory note would carry a maximum term of five years, but could be prepaid by the FSLIC. The government contends that ComFed merely submitted these bids because it was interested in gaining access to the market in the state of Oklahoma.

Shortly after submitting ComFed's alternative bids, Mr. Grieb received a telephone call from a FSLIC staff member who believed ComFed's request to include the FSLIC notes as regulatory net worth would not be acceptable and suggested that a new bid be submitted. Def. Mot. at 34 (citing Def.App. at 454, 175–76 (Grieb II, 316–17; DX–106)). Mr. Grieb immediately submitted a new bid, which did not include any request to include the FSLIC note as regulatory net worth. Ultimately, this third bid, which was submitted after the closing, was not considered by FSLIC staff, but ComFed's initial two alternative bids were.

The FHLBB accepted the first alternative bid of Commercial Federal and transferred the accounts of Territory's insured savings depositors to Commercial Federal via a formal resolution dated January 28, 1988. Pl. Ex. Q, R. This transaction was undertaken immediately after the FHLBB placed Territory into federal receivership, on January 28, 1988, as was required by regulation. The

parties also executed a "Transfer Agreement between the Federal Savings and Loan Insurance Corporation and Commercial Federal Savings and Loan Association, Omaha, Nebraska, dated January 29, 1988 re: Insured Accounts of Territory Savings and Loan Association, Seminole, Oklahoma." Pl.Ex. R. The transfer agreement neither referenced nor incorporated the forbearance letter referred to *infra.* As a part of the transaction, the FHLBB authorized the FSLIC to issue the $20 million note to Commercial Federal (Pl.Ex. S), via a formal resolution, and authorized and directed its Secretary to send a letter to Commercial Federal concerning the regulatory capital treatment of that note. Pl.Ex. Q, Resolution No. 88–54–P at 3. The forbearance letter was issued on February 1, 1988, by FHLBB Secretary John M. Buckley, Jr. and stated, in part:

> It is the FSLIC's intention that the Five–Year Promissory Note to be issued to Commercial [Federal] pursuant to a Transfer Agreement to be entered into between the FSLIC and Commercial is to be credited to Commercial's regulatory capital for purposes of reporting to the Board; therefore, for regulatory accounting purposes, Commercial may book such promissory note as a direct addition to its regulatory capital.

Pl.Ex. T.[15]

The government contends that the determinative issue regarding the Territory Acquisition is not whether ComFed received a forbearance, permitting it to count the $20 million promissory note toward regulatory capital, as it did, but rather: was that forbearance contractualized so as to withstand changes in the law. The government contends that no contract was created between the parties for plaintiffs to include in regulatory capital the $20 million promissory note. The government further contends that none of the transaction documents, including the transfer agreement, even mention any forbearance, agreement, or special treatment for goodwill. The government's position is that "although forbearances have long been

issued to institutions as a form of regulatory grace ... a forbearance is not a contract unless all the elements of contract formation have been satisfied." Def. Cont. Doc. Brief at 21.

Also, the government points out that there was, initially, some uncertainty within ComFed as well as between ComFed and the regulatory staff, with regard to how ComFed was to account for the FSLIC note. *See, e.g.,* Pl.Ex. V. Ultimately, ComFed determined to include the note in its regulatory capital calculations for as long as the principal remained unpaid, which was five years or less. Def.App. at 411, 464 (Bainbridge 153, Kjar 87).

Plaintiffs argue that the FHLBB clearly agreed to regulatory capital treatment for the $20 million note. They further contend that the FHLBB allegedly well understood the effect of this promise:

> [FHLBB Board Member White]: This is Larry White. Can you tell me a little bit about Commercial [Federal]? I mean, we are giving them an artificial boost to their capital of $20 million. That gives them the ability to leverage that perhaps as much as $500 or $600 million dollars. What can you tell us about Commercial Federal?

> [Louis Roy from FHLBank of Topeka]: They are one of our two or three best run institutions in the District or one of our largest, and one we take some pride in, at this point. We have a high degree of confidence in their management and their policies and in their portfolio.

Pl. Mot. at 22 (citing Pl.Ex. U. at 8, Transcript of January 28, 1988 FHLBB meeting, at which the FHLBB approved the transfer of Territory's saving accounts to Commercial Federal).

The plaintiffs contend that subsequent correspondence from the FHLBB confirmed that the $20 million regulatory capital "credit" from the FSLIC's promissory note was not meant to be amortized. Pl.Ex. V. Instead, it was agreed that it would be added

---

15. The government points out that as ComFed was aware when it requested permission to include the FSLIC note as net worth, ComFed did not need the forbearance in order to meet regula-

tory capital requirements after the transaction. Def. Mot. at 35 (citing Def.App. at 175–76, 177 (DX–106, 107)).

directly to Commercial Federal's books "when computing compliance with regulatory capital requirements." *Id.*

### DISCUSSION

### I. *Jurisdiction*

This court has jurisdiction over actions founded upon any express or implied contract with the United States pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000).

### II. *Standard of Review—Cross-motions for summary judgment*

This action is before the court on plaintiffs' motion for summary judgment on liability for breach of contract and defendant's cross-motion for summary judgment and opposition to plaintiffs' motion for partial summary judgment. Summary judgment is designed to secure the " 'just, speedy, and inexpensive determination of every action.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Federal Rule of Civil Procedure 1). Summary judgment is appropriate where there is no dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the United States Court of Federal Claims; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A fact is material if it would affect the outcome of the suit. *Id.* at 248, 106 S.Ct. 2505.

In considering a motion for summary judgment, the court does not "weigh[ ]" each side's evidence. *Contessa Food Products, Inc. v. Conagra, Inc.*, 282 F.3d 1370, 1376 (Fed.Cir.2002). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Enzo Biochem, Inc. v. Gen–Probe Inc.*, 285 F.3d 1013, 1017 (Fed.Cir.2002). That is, all doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its

favor. *Anderson*, 477 U.S. at 256, 106 S.Ct. at 2514. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2554; *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511; and *Mingus*, 812 F.2d at 1390–91. On cross-motions for summary judgment, the court must evaluate each motion in its own right and resolve any reasonable inferences against the party whose motion is being considered. *First Federal Savings Bank of Hegewisch v. United States*, 52 Fed.Cl. 774, 780 (2002). A cross-motion for summary judgment is one party's claim that it alone is entitled to summary judgment. *Id.*

### III. *Contract Formation—The Empire and Territory acquisitions*

#### A. *Contract principles*

The Supreme Court in *Winstar III* directed courts deciding *Winstar*-related cases to apply "ordinary principles of contract construction and breach that would be applicable to any contract between private parties." *Winstar III*, 518 U.S. at 871, 116 S.Ct. at 2453. "[A]ny agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." *CalFed II*, 245 F.3d at 1346 (quoting *Massie v. United States*, 166 F.3d 1184, 1188 (Fed.Cir.1999) (citation omitted)). These general requirements apply equally to an express and an implied contract. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir. 1997). An "implied-in-fact" contract is one "founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 426–27, 67 L.Ed. 816 (1923).

Whether a contract exists is a mixed question of law and fact. *CalFed II,* 245 F.3d at 1346 (citing *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir.1998)). If the contract terms are ambiguous, and require examination of external evidence, the matter is not appropriate for summary judgment. *Beta Sys. Inc. v. United States,* 838 F.2d 1179, 1183 (Fed.Cir.1988). The mutuality of intent of the parties, or the lack thereof, is critical to the issue of whether a contract exists because " '[a]bsent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise.' " *Southern National Corp. v. United States,* 54 Fed.Cl. 554, 557 (2002) (quoting *Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 264, 270 (2002)). Thus, the primary question currently before the court concerns the element of mutuality of intent.

### B. *The authority of the FHLBB principal supervisory agents to enter into the Empire transaction*

■ Before turning to the question of whether the documentation and supporting circumstances demonstrate the existence of a contract in the two acquisitions in this case, it is first necessary for this court to address the question of whether the principal supervisory agent of FHLBank of Topeka, who approved Commercial Federal's application to acquire Empire, had actual authority to bind the government in contract. Defendant first argued that the PSA had no authority to contract on behalf of the FHLBB in its supplemental brief on liability filed May 14, 2002. In order to prove the existence of a contract with the United States, plaintiffs must demonstrate that the PSA had actual authority to bind the United States. *First Federal Lincoln Bank v. United States,* 54 Fed.Cl. 446, 452 (2002) (citing *Trauma Serv. Group v. United States,* 104 F.3d 1321, 1325 (Fed.Cir. 1997); *Total Med. Mgmt., Inc. v. United States,* 104 F.3d 1314, 1319 (Fed.Cir.1997)). Actual authority can be either express or implied in fact. *First Federal Bank,* 54 Fed. Cl. at 452 (citing *H. Landau & Co. v. United States,* 886 F.2d 322, 324 (Fed.Cir.1989)).

" 'Government employees hold express actual authority to bind the government in contract only when the Constitution, a statute, or a regulation grants them such authority in unambiguous terms.' " *First Federal Bank,* 54 Fed.Cl. at 452 (quoting *Starflight Boats v. United States,* 48 Fed.Cl. 592, 598 (2001)). *See also Roy v. United States,* 38 Fed.Cl. 184, 189 (1997) (stating that "[a]ctual authority may be implied when such authority is 'an integral part of the duties assigned to a [g]overnment employee' ").

Prior to the passage of FIRREA, the FHLBB and FSLIC possessed ultimate regulatory authority with respect to the thrift industry. 12 U.S.C. §§ 1725–1730 (1982) (repealed). Supervisory authority was dispersed among twelve regional "Federal Home Loan Banks," and the president of each regional bank was the PSA of thrifts in the region. 12 C.F.R. § 501.11 (1987). Many acquisitions and related agreements were approved by the agency's twelve district offices pursuant to authority delegated to them by the FHLBB, as the FHLBB could delegate authority to officials of the FHLBanks, including PSAs to act on behalf of the FHLBB itself. *See* 12 U.S.C. § 1437(a) (1988). Under regulations of the FHLBB, the PSAs acted as agents of the FHLBB within their districts. *See* 12 C.F.R. §§ 501.10, 501.11, 541.18, 561.35 (1985).

In *Fifth Third Bank v. United States,* 52 Fed.Cl. 637 (2002), the court undertook a detailed analysis of the question of whether the district representatives had implied actual authority to bind the FHLBB to promises regarding the use and amortization of goodwill. In *Fifth Third,* like here, the government did not argue that PSAs could not approve acquisitions and mergers, but it argued that the authority to "approve" such transactions did not correspond with the authority to "contract" relative to goodwill accounting. In *Fifth Third,* Judge Miller examined the FHLBB's incremental expansion of the regional banks' authority to approve larger transactions and supervisory mergers. *Id.* at 641. She traces how in 1980–81 FHLBB gradually expanded the PSAs' authority to allow them to approve larger transactions and supervisory mergers not in-

volving an agreement with FSLIC or requiring forbearance with respect to supervisory action under the regulations. *See id.* (citing Delegation of Authority Regarding Merger Approvals, 46 Fed.Reg. 14,727 (Mar. 2, 1981); Amendments Regarding Mergers, 45 Fed. Reg. 50,553 (July 30, 1980); and Delegation of Authority Regarding Merger Approvals, 46 Fed.Reg. 37,628, 37,629 (July 22, 1981)). FHLBB continued to expand the PSAs authority in 1982 and 1983, allowing them to "agree to certain forbearances in approving supervisory mergers which are currently granted by the board;" approve mergers in which goodwill was included in assets among unassisted transactions; 47 Fed.Reg. at 8152; and negotiate and approve certain mergers and acquisitions of eligible institutions and to authorize financial assistance from the FSLIC to facilitate such mergers or acquisitions, Voluntary Assisted–Merger Program, 48 Fed.Reg. at 27,376. *Id.* at 641, 642.

In *Fifth Third,* the court also considered the government's argument that no implied delegation can be found because the same regulation granting the PSAs authority prohibits PSAs from approving transactions involving "any agreement with the Federal Savings and Loan Insurance Corporation." As in the case currently before this court, in *Fifth Third,* the government's position was that a goodwill contract is an agreement between the acquiring institution and FSLIC. The government in the case at bar argues that as of January 16, 1987 and February 20, 1987, the dates the PSA conditionally approved the acquisition here pursuant to section 563.22, the regulations expressly provided the PSA was not delegated authority to enter a "transaction [that] involves any agreement with the Federal Savings and Loan Insurance Corporation." 12 C.F.R. § 563.22(f)(1)(iv) (1987). The court in *Fifth Third* rejected defendant's same contention, and found that this limitation on PSAs' authority concerns only agreements to which FSLIC was a party, i.e., *assisted transactions* in which FSLIC provided a cash contribution to facilitate the acquisition of a failing thrift, and not the kind of approvals and agreements delegated to the PSAs to deal with mergers in their respective districts (which were likewise involved here). *Fifth*

*Third,* 52 Fed.Cl. at 642–43. *See also First Federal Lincoln Bank v. United States,* 54 Fed.Cl. 446, 452 (2002) (stating that 12 C.F.R. § 546.2(h)(8) (1982) (repealed), which prohibited the PSA from approving a merger that involved "any agreement with the Federal Savings and Loan Insurance Corporation" limits the authority of PSAs only in assisted transactions, not in unassisted transactions).

The court concluded that after the 1982 delegation, such PSAs clearly had implied actual authority to bind the FHLBB to promises regarding the use and amortization of goodwill. *Fifth Third,* 52 Fed.Cl. at 640–43. The court stated:

> The ability of the regional banks to make promises regarding the use of supervisory goodwill therefore was integral to fulfilling their role in FHLBB's policy to encourage the private acquisition of failing thrifts. The court finds that, as of the 1982 delegation, the [FHLBank of] Cincinnati had implied actual authority to bind FHLBB to promises regarding the amortization and use of supervisory goodwill contained in plaintiff's application.

*Id.* at 643.

Similarly, in *First Federal Lincoln Bank* the court held that "the regional bank ... had implied authority to bind itself to promises regarding amortization and use of goodwill towards regulatory capital." *First Federal Lincoln Bank,* 54 Fed.Cl. at 453. *See also Southern National* (stating that "for the reasons discussed in *First Federal Lincoln Bank* the court rejects defendant's argument and holds that the PSA had authority to bind the government to an alleged contract in which FSLIC played no part"). Then–Chief Judge Smith reached the same conclusion regarding the issue of authority of the PSAs to contract (one of the common issues) in *California Federal Bank v. United States,* 39 Fed.Cl. 753 (1997) (*CalFed I*), *aff'd,* 245 F.3d 1342 (Fed.Cir.2001) (*CalFed II*), *cert. denied,* 534 U.S. 1113, 122 S.Ct. 920, 151 L.Ed.2d 884 (2002) (collectively *CalFed*). The *CalFed I* decision noted that the government argument was "difficult to understand" given that the FHLBB had expressly delegated to its

PSAs in the district offices the authority to approve acquisitions in which goodwill was generated and included in the acquiring thrift's regulatory capital. *Id.* at 776. Chief Judge Smith found his conclusion to be supported alternatively "by express grant of authority ..., implied actual authority ..., or ratification (given the FHLBB's necessary approval and/or constructive knowledge of the transaction...."). *Id.* at 777, n. 28.

Defendant has set forth no compelling reason for the court to depart from the court's opinions in *Fifth Third; First Federal Lincoln Bank;* and *CalFed I.* Defendant's principal argument is that ComFed's application sought approval under delegated authority pursuant to 12 C.F.R. § 563.22(f)(1)(iv) (1987) and 12 C.F.R. § 571.5 (1986). The conditional approval letter specifically states that the application was being approved pursuant to the "delegated authority conferred per Federal Regulation 584.4 and Insurance Regulation 563.22." Pl.Ex. F. Section 571.5 states:

> General policy. This is a statement of the Federal Home Loan Bank Board's general policy on merger and transfer proposals. It does not ordinarily apply to mergers and transfers instituted for supervisory reasons.... Potential merger and transfer applicants are encouraged to review proposed transactions with the Supervisory Agent prior to proceeding with the formal application process. Generally, the Board regards mergers or transfers primarily as business decisions to be made by the institutions involved.

12 C.F.R. § 571.5(a) (Sept.1986).

The government notes that ComFed affirmatively represented to the FHLBB that the "[a]pplication may be processed by the ... [PSA] under delegated authority ... based upon the fact[ ] that ... the application does not appear to raise any significant issue of law or policy." Pl.Ex. A. Significantly, however, even though in this case there is no dispute that Commercial Federal's application was not processed under the specific supervisory delegations, the fact remains that the PSA did have authority to approve unassisted mergers in which goodwill was included in net assets in regulatory capital.

*See Fifth Third,* 52 Fed.Cl. at 643; *CalFed I,* 39 Fed.Cl. at 776; and discussion *supra.* The court views defendant's argument regarding ComFed's assertions in the application as bearing more on whether a contract actually existed, rather than on the issue of whether the PSA had authority to approve such a contract.

Accordingly, the court finds that because this case occurred subsequent to the FHLBB's 1982 delegation of the authority to approve unassisted mergers in which goodwill was included in net assets and regulatory capital, the PSA in this case had implied actual authority to bind the FHLBB to any promises regarding the use and amortization of goodwill vis a vis the Empire transaction. Of course, whether such a contract existed is a separate question altogether, to which the court will now expressly turn.

### C. *Winstar-related background principles*

As stated *supra,* the irreducible question in this case, as in other *Winstar*-related cases, is whether the government made a binding promise to provide certain regulatory treatment for the transactions at bar. *See Winstar III,* 518 U.S. at 868–69, 116 S.Ct. at 2452. The principal case law controlling the issues in this case is that in the Supreme Court's plurality opinion in *Winstar III,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), as well as that in the Federal Circuit's majority *en banc* decision in the same case, *Winstar II,* 64 F.3d 1531 (Fed.Cir.1995). In *Winstar III,* the Supreme Court found that contracts existed based on the documentation of the transactions, including express agreements in the form of assistance agreements and supervisory action agreements with integration clauses. *Winstar III,* 518 U.S. at 864–66, 116 S.Ct. 2432. Another controlling case, *CalFed,* also involved the acquisition of insolvent savings and loan institutions to account for the acquisition using the purchase method of accounting, which created substantial amounts of supervisory goodwill. Unlike the transactions at issue in *Winstar, Glendale,* and *Statesman,* however, two of the three mergers (Brentwood and Family) in the *CalFed* case were "unassisted." *See*

*CalFed II,* 245 F.3d at 1342. It is these transactions for which *CalFed* is of significant import to the resolution of this matter, as the government provided the acquiring institution no direct financial assistance or capital credits as inducements to save the failing thrift.

Significantly, the Federal Circuit in *CalFed II,* affirming the Court of Federal Claims' opinion in *CalFed I,* found contracts based on less documentation to demonstrate the existence of a contract than that relied upon by the Supreme Court in its *Winstar* decision. The Federal Circuit concluded that the documents and the circumstances surrounding their creation were sufficient to find that the parties entered into a contract allowing the amortization of supervisory goodwill. *CalFed II,* 245 F.3d at 1347–48. The Federal Circuit found that assistance and supervisory agreements were not necessary to find a contract with the government. *CalFed II,* 245 F.3d at 1346–47. For instance, unlike the transactions reviewed in the early test cases, these promises were not memorialized in an assistance agreement. Nor did the transaction include an integration clause incorporating the negotiations and documents into one agreement. The transaction, however, did include a regulatory capital maintenance/dividend agreement (RCMA), a FHLBB Resolution approving the merger, and a forbearance letter issued by the regulators. In reaching its conclusion, the Federal Circuit reasoned:

> [I]f the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and [FHLBB] resolutions confirm that intent, the absence of an [assistance agreement] or [supervisory action agreement] should be irrelevant to the finding that a contract existed.

*Id.* at 1347 (citation omitted).

In *CalFed,* 39 Fed.Cl. at 773, this court noted, and the Federal Circuit affirmed, that "[c]ontracts are not technical documents requiring certain forms. Rather, they are legal relationships imposed by the law on parties when certain functional requisites like intent, offer, acceptance, and consideration occur in

logical sequence." This court also has noted that regulatory documents can be construed as contractual commitments where the reality of the transaction supports such a construction. *Fifth Third,* 52 Fed.Cl. at 274. In *CalFed II,* the court reiterated its holding in *Winstar II,* 64 F.3d at 1542, that "[i]f the parties did not intend to use supervisory goodwill for regulatory capital purposes there would simply be no reason for the extensive negotiations and the conditions regarding its use." *CalFed II,* 245 F.3d at 1347. *See also Winstar II,* 64 F.3d at 1541–42 (stating that in addition to "all of the contemporaneous documents," its conclusion that a contract had been formed in the *Glendale* case was "supported by other evidence and by the circumstances surrounding the transaction").

We have closely examined the *CalFed* decisions, and have attempted to compare the documents and circumstances in that case to the documents set forth in the pleadings of this case. As Judge Baskir stated in *Admiral Financial Corp. v. United States,* 51 Fed. Cl. 366 (2002), it is not, however, possible in every instance to determine what weight Judge Smith or, on appeal, the Federal Circuit afforded each provision within the *CalFed* documents. Further, we have considered the rapidly evolving body of precedent from other judges on this court applying the *CalFed II* decision to the facts of their respective cases in the consideration of the presently pending matter.

### D. *The existence of a contract in the Empire acquisition*

#### 1. *Regulatory policy versus bargained for acquisition*

As is well documented, in the 1980's the government pursued a policy of inducing "healthy" financial institutions to acquire failing thrifts in exchange for supervisory goodwill forbearance. However: "The fact that the Government may have been willing to encourage a given transaction by promising certain regulatory treatment does not eliminate the dispute as to whether it actually made a contractual promise. The Court of Federal Claims cannot imply a contract as a

legal conclusion where no such contract exists as a matter of fact." *Fifth Third,* 52 Fed.Cl. at 277. Of course, however, regulatory documents may be construed as contractual commitments where the reality of a transaction favors such a construction. *Fifth Third,* 52 Fed.Cl. at 274. *See also CalFed II,* 245 F.3d at 1374. The burden of proving that the reality of a transaction favors construing such documents as contractual undertakings, as opposed to regulatory activities, remains with the plaintiff. *Fifth Third,* 52 Fed.Cl. at 275.

As it has in myriad other *Winstar*-related cases, as discussed at length, *supra* and *infra,* the government's principal argument in this case is that the treatment of supervisory goodwill was merely a matter of then-prevailing regulatory policy, and not a bargained for element of a contractual promise. *See* facts and arguments section *supra.* As the court discussed in *Fifth Third:*

> In its sovereign capacity as regulator, the Government routinely applies and enforces standards to which private entities must conform their activities. Private parties often are required to obtain the approval of an administrative agency for a given course of conduct spanning a given period of time. The regulatory act of approval is ordinarily a statement that the conduct conforms with existing law or policy and no more. Absent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise.

*Fifth Third,* 52 Fed.Cl. at 270 (citations omitted).

That notwithstanding, as found in Winstar, *CalFed,* and numerous other *Winstar* cases, the government does make promises regarding its regulatory function. Significantly, however, each decision is necessarily fact-specific. *See Winstar III,* 518 U.S. at 861, 116 S.Ct. at 2448 (wherein the Supreme Court undertook a separate, fact intensive analysis for each of the transactions at issue). *See also CalFed II,* 245 F.3d at 1347 (stating that the relevant issue was whether "the factual records of individual cases show in-

tent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda, and Bank Board resolutions confirm that intent"). *See also Advance Bank v. United States,* 52 Fed.Cl. 286, 288 (2002) (stating that "[n]othing in the *Winstar* and *California Federal* decisions supports the proposition that every savings and loan merger approved by the FHLBB during the period in question bound the government to a specified goodwill treatment (and was breached by FIRREA) regardless of whether there was a bargained-for exchange with the government"). The government's primary arguments in these cases have rested on this idea: that the existence of a contract depends upon the factual circumstances of the individual transactions. And in this particular case, counsel for the government has done a fine job of examining the relevant documents and establishing why they are regulatory, rather than contractual, in nature.

Following a thorough examination of the volumes of alleged contract documents and careful consideration of hundreds of pages of briefing on this issue and relevant authority, this court must conclude that there was not mutual assent to contract in this case, and therefore plaintiffs' motion for summary judgment is denied with respect to the issue of liability regarding the Empire acquisition; and the government's cross-motion for summary judgment regarding liability in the Empire transaction is granted. In the view of this court, the documents and accompanying evidence upon which plaintiffs rely simply do not establish the intent to enter into either an express or implied contract. The court recognizes that although there are factual issues concerning the parties' negotiations and the health of Empire, there are no genuine issues of material fact in dispute, because there was simply no mutual assent to *contract* to a specific accounting treatment vis a vis the Empire acquisition and, accordingly, a trial would not affect the outcome of this question.

### 2. *Documentary evidence*

In this case, the undisputed evidence shows that there was no assistance agree-

ment executed by the FSLIC; no forbearance letter issued by the FHLBank of Topeka or the FHLBB; no integration clause; and no Board resolution issued by the FHLBB. Rather, plaintiffs' request was embedded in its application, which implicitly was approved by the requirement of an accountant's letter and the submission of the accountant's letter confirming plaintiffs' intentions. Plaintiffs state that the goodwill resulting from Commercial Federal's acquisition of Empire Savings was reported to be $139,332,000 in amount, and it was reported that this would be amortized consistent with GAAP for up to 25 years. Pl. Mot. at 18 (citing Pl.Ex. H at 32). In addition, another $50,812,000 was recorded as a distinct intangible asset, i.e., the core value of Empire's deposits, which was to be amortized consistent with GAAP on a straight-line basis over 15 years. Pl. Mot. at 18 (citing Pl.Ex. G).

In support of their claim of a contract, as discussed at length *supra*, the plaintiffs rely primarily upon the following in terms of documentary evidence: (1) the stock purchase agreement that it entered with Empire; (2) the written application to acquire Empire Savings that was sent to the FHLBB and FHLBank of Topeka on October 30, 1986 and accompanying accountant's letter; (3) the FHLBB's request for additional information requesting evidence that the resulting institution would be able to meet its net worth requirements; (4) The January 16, 1987 Amendment No. 2 to ComFed's application wherein plaintiffs advised the FHLBB that ComFed would be issuing $60 million of preferred stock as part of the proposed acquisition of Empire Savings rather than the common stock projected in its 10/30/86 application; (5) the FHLBB's January 16, 1987 conditional approval of ComFed's application (as amended) to acquire Empire Savings and to merge it into ComFed; (6) FHLBB's July 22, 1987 letter that ComFed had satisfactorily complied with the requirements of the January 16, 1987 letter; and (7) The fact that the goodwill resulting from ComFed's acquisition of Empire Savings was reported to be $139,332,000 in amount, and it was reported that this would be amortized consistent with GAAP for 25 years; another $50,812,000 was recorded as a distinct intangible asset which

was to be amortized consistent with GAAP on a straight-line basis over 15 years; and $60 million from ComFed's sale of the preferred stock in connection with its acquisition of Empire was included in its regulatory capital. The court will examine each of these purported contract documents in turn.

In support of their claim of a contract, plaintiffs rely upon the stock purchase agreement that they entered with Empire, in which ComFed agreed to pay Baldwin $45 million for all of the issued and outstanding permanent capital stock of Empire. Plaintiffs rely on the fact that Commercial Federal's contract to acquire Empire from its prior owner was conditioned on the FHLBB's agreement to the transaction "without the imposition of conditions ... which are materially burdensome." Pl.Ex. C at 31. Thus, plaintiffs contend, they "retained the express right to walk away from the transaction if they could not reach an acceptable agreement with the FHLBB concerning regulatory capital (or other) terms." Pl. Mot. at 10.

The court agrees with the government, however, that this agreement does not establish the existence of a bargained for agreement between plaintiffs and the government, and it does not condition the purchase of Empire on any certain treatment of goodwill by the government or on any agreement with the government whatsoever. As defendant points out, the stock purchase agreement cannot be a contract between plaintiffs and the government because it is a privately negotiated agreement between ComFed, Baldwin, and Empire in which the government played no role whatsoever. Significantly, at one point prior to closing, some of the decision-makers at ComFed began to have second thoughts about whether to even consummate the transaction. ComFed attempted to re-negotiate the purchase price, but Baldwin would not accept anything less than $45 million. This underscores the transaction as being a privately negotiated deal between private parties, requiring government approval. The clause in the merger agreement which provided that ComFed (as well as any of the other parties to the agreement—i.e., Baldwin and Empire) retained the right to walk away from the transaction if FHLBB

imposed conditions which were materially burdensome, did not, in any fashion, impose any contractual obligation flowing between FHLBB and the parties to the merger agreement. FHLBB was not a party to the merger agreement and the fact that the actual parties to that agreement agreed between themselves that any one of them could walk away if FHLBB took a particular action that displeased them did not make FHLBB a party to the contract or agreement. Further, contrary to plaintiffs' argument, the language in the merger agreement does not demonstrate any agreement on the part of FHLBB to contract to certain regulatory capital terms. Accordingly, the court finds plaintiffs' argument that the merger agreement supports its claim of a contract legally unavailing.

In support of their claim of a contract, plaintiffs also rely upon the written application to acquire Empire Savings that was sent to the FHLBB and FHLBank of Topeka on October 30, 1986. Specifically, plaintiffs allege that the "proposed accounting procedure" to be followed by Commercial Federal was described in the 10/30/86 letter of an independent accounting firm, which appears as one of the attachments to Commercial Federal's application. The letter states that goodwill would result from the proposed acquisition and that the "purchase method" of accounting would be used to calculate the goodwill and its amortization period "in accordance with generally accepted accounting principles." Pl.Ex. B. The application also advised FHLBB that the holding company would need to raise additional equity capital at the time of the acquisition in order to ensure that combined institution would meet its capital requirements. Further, plaintiffs state that the pro forma financial statements as of 6/30/86 show that the goodwill projected to be generated from ComFed's acquisition of Empire was $80 million. Pl. Cont. Doc. Brief at 6.

The court is persuaded by the government's position that the application constitutes a necessary regulatory step and does not reflect an intent to contract on the part of the parties. By statute, no insured thrift could acquire or merge with another insured thrift without the approval of the FHLBB. 12 U.S.C. § 1730(a) (1987) and 12 C.F.R. § 563.22(a) (1987). Also significantly, the accountant's letter was required to be submitted because "[w]here goodwill has been included in the resulting institution's assets, the applicant must submit an opinion of a certified public accountant, satisfactory to the Principal Supervisory Agent, that its use and value are appropriate under, and accounted for by, generally accepted accounting principles." 12 C.F.R. § 563.22(e)(1)(xii) (1987). Furthermore, with regard to ComFed's statement that additional capital would be raised, this information was required pursuant to 12 C.F.R. § 563.22(e)(1)(xii) (1987), because under the proposed merger "the resulting associations' regulatory capital would not at least equal the amount required under the Board's regulatory capital requirements." 12 C.F.R. § 563.22(e)(1)(xii) (1987). Further, regarding the inclusion in the application of increased amounts of delinquent loans at Empire, the government points out, *inter alia*, that this information was included in response to Item 10 of the application requiring "Financial Condition and Operations" information.

Plaintiffs also point to the FHLBB's request for additional information, requesting that ComFed "provide a statement of the condition of the combined entities as of September 30, 1986" and "provide evidence that the resulting institution will be able to meet its net worth requirement under the regulations that go into effect January 1, 1987." Pl.Ex. D. In response, ComFed submitted Amendment No. 1 to its application, which included additional pro forma financial projections demonstrating that the combined institution would comfortably exceed the applicable regulatory capital requirements, assuming that the combined institution included the purchase accounting intangibles in its regulatory net worth. Plaintiffs also argue that had they believed that the government, following the merger, could, for example, implement a change in goodwill accounting that would force the institution out of capital compliance, Commercial Federal would have had to disclose that possibility in response to the government's request for as-

surances about regulatory capital compliance following the Empire acquisition.

The government's request for additional information and plaintiffs' compliance therewith merely demonstrates that ComFed intended to account for the transaction in accordance with GAAP. There was no provision ensuring this accounting treatment would remain in the event of a regulatory change. As discussed at length above: "The regulatory act of approval is ordinarily a statement that the conduct conforms with existing law or policy and no more. Absent some evidence of contractual intent, no promise can be found, whether it be a promise to continue to regulate in a certain manner for a certain period of time, a promise to insure against a change in the law, or otherwise." *Fifth Third*, 52 Fed.Cl. at 270. In the view of this court, the request for additional information is nothing more than a request for assurance that the resulting entity from the acquisition would meet then-existing regulatory requirements. Although this documentation may, arguably, reflect an *approval* of a certain accounting treatment, in the view of the court the documentation does not reflect any intent on the part of the government to *agree* to any protection for the use of goodwill for a period of years.

In support of their claim of a contract, plaintiffs also point to the January 16, 1987 Amendment No. 2 to ComFed's application, wherein plaintiffs advised the FHLBB that ComFed would be issuing $60 million of preferred stock as part of the proposed acquisition of Empire Savings rather than the common stock projected in its 10/30/86 application. The court, however, agrees with the government that the amendment does not reflect any "bargained for" exchange between ComFed and the government, as the documentation here consists of nothing more than standard regulatory submissions that were mandatory for this type of preferred stock issuance. *See* Section 563.7–5(a) of the Rules and Regulations for Insurance of Accounts for the Issuance or Sale of Preferred Stock by an Institution Insured by FSLIC (stating that "[n]o insured institution shall issue mandatorily redeemable preferred stock includable in regulatory capital

pursuant to this section or amend the terms of such preferred stock unless it has obtained the written approval of the Corporation").

Plaintiffs also rely heavily on the conditional approval letter dated January 16, 1987 from Mr. Mowbray, in which the FHLBB conditionally approved Commercial Federal's Application (as amended) to acquire Empire Savings and to merge it into Commercial Federal. Pl. Mot. at 13 (citing Pl.Ex. F). The acceptance letter sets forth eight numbered "conditions" to the acquisition approval, with compliance by ComFed requested within a specific time period. The court will address the relevant conditions in turn.

First, plaintiffs point to the preferred stock conditions, which state that proceeds of the preferred stock sale were to provide additional capital to Commercial Federal in connection with its acquisition of Empire. The FHLBB's "condition" stated that the sale of the preferred stock "must occur prior to, or simultaneously with," Commercial Federal's acquisition of Empire Savings. *Id.* (citing Pl.Ex. F, Condition 2; Pl.Ex. L). On January 30, 1987, ComFed applied to the FHLBB to issue $60 million of preferred stock and to include the proceeds of the sale as regulatory capital. Pl.Ex. J. This application was conditionally approved by letter of April 15, 1987. Pl.Ex. L.

The government points out that this was a standard regulatory approval letter, and that any thrift seeking to issue this type of preferred stock would have received the same instructions with respect to the inclusion of such proceeds in its regulatory net worth. As such, the preferred stock conditions do not establish the existence of a bargained for exchange pursuant to which plaintiffs could include the $60 million preferred stock issuance as regulatory capital. Rather, in the view of this court it merely establishes *permission* to do so. ComFed analogizes this preferred stock approval letter to the capital credit in the Statesman transaction, discussed in *Winstar III*, 518 U.S. at 866–67, 116 S.Ct. at 2450–51. Nevertheless, the court agrees with the government that the situation is different in *Winstar* where Statesman was allowed to treat $26 million of

FSLIC's assistance as a permanent capital credit than the instant case, which simply granted ComFed approval for what the regulation specifically allowed.

The FHLBB's January 16, 1987 acceptance letter also required that Commercial Federal send to the FHLBB PSA in Topeka a "statement of financial condition of the applicant and association as of the effective date of the acquisition and merger, including footnotes on purchase accounting and an accountant's statement certifying that the use of purchase accounting is in accordance with GAAP." Pl. Mot. at 16 (quoting Pl.Ex. F, Condition 6(c)). Plaintiffs contend this letter represents the FHLBB's "acceptance" of ComFed's "offer" to utilize purchase accounting pursuant to GAAP in both calculating and recording the goodwill and other intangibles created by the Empire acquisition and amortize them in accordance with GAAP. Commercial Federal complied with this condition by submitting its preliminary "purchase accounting" unaudited pro forma combined balance sheet as of the date of the merger, which sets forth the results of ComFed's mark-to-market analysis of Empire. This information reported that goodwill had risen to $145.7 million, and that the purchase method of accounting had been utilized including amortization of resulting goodwill in accordance with GAAP.

As the government argues, however, the conditions requiring an accountant's opinion describing that the transaction had been accounted for in accordance with GAAP was a standard condition in the approval letters. *See* 12 C.F.R. § 563.22(e)(1)(xii) (1987). Thus, as the court in *Advance Bank v. United States*, 52 Fed.Cl. 286 (2002) found, we cannot "infer liability" from the statement in the "conditional approval letter requiring an accountant's letter consistent with GAAP since virtually all business entities are required to comply with such standards." *Id.* at 289. This court agrees with the statement of the *Advance Bank* court that the conditional approval letter contrasted "starkly" with the forbearance letters in *CalFed*,

> which following a detailed description of purchase accounting and the periods for goodwill amortization and accretion of dis-

count, expressly stated: "Notwithstanding any change in generally accepted accounting principles or interpretation thereof, the Resulting Association may report for any and all reports to the FHLBB its financial condition and operations in accordance with the accounting method described in the preceding sentence."

*Id.* at 289 (quoting *CalFed I*, 39 Fed.Cl. at 753).

Thus, even though the accountant's letter did set forth plaintiffs' intention to utilize purchase accounting pursuant to GAAP in both calculating and recording the goodwill and other intangibles created by the Empire acquisition and amortize them in accordance with GAAP, it neither contributed to nor reflects the existence of a contract.

A third condition required the holding company Commercial Federal Corporation to stipulate that it would agree to a restricted dividend policy and would ensure that the regulatory capital of Commercial Federal Bank remained consistent with the FHLBB regulatory requirements, specifically section 563.13(b) of the Rules and Regulations for Insurance of Accounts, and, if necessary, the holding company would infuse additional capital to keep the institution in compliance. Commercial Federal agreed to accept a restricted dividend policy and pledged to maintain the regulatory capital of its subsidiary thrift following its acquisition of Empire. Plaintiffs contend that Commercial Federal would never have issued this stipulation absent an understanding that the government had promised to count both the goodwill and the $60 million of preferred stock as regulatory capital. The government contends that ComFed was required to ensure that the resulting institution would satisfy the regulatory net worth requirements and infuse capital if necessary. *See* 12 C.F.R. § 574.8(a)(iv)(A) (1987). The court does not see how this agreement in any way reflects a mutual intent to contract. This conclusion comports with the court's opinion in *Southtrust of Georgia, Inc., et al. v. United States*, 54 Fed.Cl. 741, 746 (2002), wherein the court found a regulatory capital maintenance/dividend agreement executed by the acquiring thrift actually placed the burden of change in

the regulatory capital maintenance requirements on the plaintiffs.

On May 1, 1987, Commercial Federal notified the government by letter that its acquisition of Empire Savings' stock was consummated on April 30, 1987 and the merger of Empire into Commercial Federal occurred the following day on May 1, 1987. Pl. Cont. Ex. 20 at 1. In this letter, ComFed's counsel also submitted most of the documents required to satisfy the conditions set forth in the FHLBB's 1/16/87 letter. On July 14, 1987, ComFed submitted its remaining compliance materials to FHLBB. In a letter of July 22, 1987, FHLBB Supervisory Agent William M. Humenczuk stated that the materials sent to the FHLBB regarding evidence of compliance with the requirements set forth in the January 16, 1987 letter were reviewed by the FHLBB and found satisfactory to "fulfill the conditions of approval." Because this court has determined that the respective conditions of approval imposed by regulation do not reflect a mutual intent to contract, it follows that the satisfaction of these requirements and acknowledgment thereof also does not constitute a contract.[16]

A " 'regulatory act of approval is ordinarily a statement that the conduct conforms with existing law or policy and no more. Absent some contractual intent, no promise can be found.'" *Southern National*, 54 Fed.Cl. at 560–61 (quoting *Fifth Third*, 52 Fed.Cl. at 270; *Winstar III*, 518 U.S. at 913, 116 S.Ct. 2432 (Breyer, J., concurring)). On balance, in this case the documents do not reflect a "bargained for" exchange—a mutual intent to contract. Although the court does not doubt that plaintiffs intended to incorporate the favorable accounting indefinitely, the evidence, in the view of this court, simply does not reflect a bargained for exchange and a promise on the part of the FHLBB that the plaintiffs could account for the transactions using the purchase method, amortize good-

will, and count the goodwill toward plaintiffs' regulatory capital even in the face of a regulatory change. As the court stated in *Southtrust of Georgia v. United States*, 54 Fed.Cl. 741, 747 (2002): "None of the indicia of a bargained for exchange in connection with goodwill exists." Simply because the Empire acquisition occurred under pre-FIRREA regulations and plaintiffs were permitted, under those regulations, to use goodwill for regulatory capital purposes does not mean that the government entered into a contract.

The court finds telling in this regard the fact that in March 1989, Mr. Fitzgerald sent a letter to Danny Wall, then-chairman of the Board, wherein he states that after acquiring Empire it became "quite clear that the balance sheet of Empire seriously understated the true condition of the Association and, in fact, ComFed had effectively taken over a FHLBB/FSLIC problem institution," and therefore requested an " 'exemption' " for the proposed changes to the treatment of regulatory capital, which he considered to be equivalent to a " 'change of rules' during the game." Def.App. at 293–94. If Mr. Fitzgerald actually believed that there had been an intent to contract for a certain accounting treatment, then there would have been no need for him to request such an exemption and attempt to retroactively create a contract, as he would have only needed to seek to enforce the terms of the contract.

### 3. *Comparison to other cases*

Although this court is certainly aware that in most of the *Winstar*-related cases courts have either found the existence of a contract or denied summary judgment, after carefully considering these cases it is the court's view that this case has significantly less documentary evidence on which to base a contract than such cases, and is more akin to those cases in which courts have either denied

---

16. It is undisputed that the goodwill resulting from Commercial Federal's acquisition of Empire Savings was reported to be $139,332,000 in amount, and it was reported in ComFed's annual report that this sum would be amortized consistent with GAAP for up to 25 years. Pl. Mot. at 18 (citing Pl.Ex. H at 32). In addition, another $50,812,000 was recorded as a distinct intangible asset, i.e., the core value of Empire's depos-

its, which was to be amortized consistent with GAAP on a straight-line basis over 15 years. Pl.Ex. G. Also, the FHLBB's 1987 examination report included the goodwill and other intangibles attributable to the acquisition of Empire, and noted that $60 million of regulatory capital resulted from Commercial Federal's sale of the preferred stock in connection with this acquisition of Empire.

summary judgment or granted summary judgment in favor of the government.

### a. *Winstar and CalFed*

A comparison of the Glendale transaction in *Winstar*[17] to the Empire acquisition reveals that the two acquisitions are factually distinguishable. In *Winstar*, FSLIC and Glendale had entered into a written contract—a supervisory action agreement, or "SAA"—under which FSLIC provided assistance to facilitate the transaction. *Winstar*, 64 F.3d at 1537. Moreover, FHLBB passed a resolution approving the Glendale transaction that required Glendale to "submit a stipulation that any goodwill arising from this transaction shall be determined and amortized in accordance with [Bank Board] Memorandum R–31b." *Winstar*, 64 F.3d at 1540–41. Also, as in plaintiffs' Empire transaction, FHLBB required the submission of an accountant's letter justifying the use of the purchase method under GAAP, specifically describing any goodwill, and substantiating the reasonableness of amounts attributed to goodwill and the resulting amortization periods. *Id.* at 1541. The Federal Circuit did emphasize the accountant's letter as confirming as of the date of closing the amount of goodwill resulting from the merger under the purchase method of accounting and reiterating the amortization periods and the amounts of goodwill to be amortized. *Id.* at 1541–42 (stating that the FHLBB and FSLIC "were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the approved accountant's letter").

By contrast, Commercial Federal's transactions were not memorialized by means of supervisory action agreements, resolutions, or integration clauses. Here, Commercial Federal has not provided evidence that there was an "agreement" embodying mutuality of intent with the government for a specific amortization period. In contrast to the Glendale transaction, the documents in the Empire transaction reflect a variety of contemplated amortization periods. A review of the

pleadings and documents also reflects the vacillating nature of the alleged contract. In the application, plaintiffs applied pursuant to GAAP, as required, and the pro forma financials reflected a ten year amortization period for goodwill. Def.App. at 88. Plaintiffs' complaint, however, does not plead a contract pursuant to GAAP, rather, it states that there was a contract for twenty-five years. ComFed's CEO claims a 30–year then a 20–year period of amortization. Def.App. at 583, 583A (Fitzgerald I at 223, 241). To add further confusion to what constitutes the terms of the alleged contract, the accountant's letter of July 8, 1987 describes the period as "the shorter of a period no greater than the estimated remaining life of the long-term interest bearing assets acquired or 25 years." Pl.Ex. G. The pro formas submitted with that letter described a 15–year period of amortization. Pl. Cont. Ex. at 82. For the foregoing reasons, the court finds in the case at bar the existence of the accountant's letters to be wholly inadequate to rise to the level of a contract. The Supreme Court in *Winstar* found that "the accounting treatment to be accorded supervisory goodwill and capital credits was the subject of *express arrangements* between the regulators and the acquiring institutions," and the court finds no such *express arrangement* in this case. *Winstar*, 518 U.S. at 853, 116 S.Ct. at 2445 (emphasis added).

*CalFed* involved the acquisition of insolvent savings and loan institutions under the supervision of the FSLIC. In *CalFed*, the acquiring institution made a specific written request to the FHLBB for "purchase method accounting using the straight line method over the estimated useful life of 35 years [and in other cases over 40]." *CalFed II*, 245 F.3d at 1345. The FSLIC also permitted those institutions to account for the acquisition using the purchase method of accounting, which created substantial amounts of supervisory goodwill. Thus, in *CalFed* the court found that plaintiffs expressly requested and received supervisory forbearances to

---

17. After a decision was issued on liability, *Winstar Corp. v. United States*, No. 90–8C, *Statesman Sav. Holding Corp. v. United States*, No. 97–773C, and *Glendale Federal Bank v. United States*, No.

772C, were consolidated for appeal under the style *Winstar Corp. v. United States*. *See Winstar II*, 64 F.3d at 1533.

use the purchase method of accounting and to amortize goodwill over a specific period. *CalFed II*, 245 F.3d at 1345.

The court views the evidence before the court in *CalFed* regarding the existence of a contract to be much stronger than that in this case. In the case at bar there is no evidence in the form of a forbearance letter or FHLBB Resolution confirming or specifying the amortization period. Also, there is no FHLBB Resolution approving the merger as there was in *CalFed*. Further, in the transaction at bar, no independent request for a favorable accounting treatment was made by plaintiffs and no explicit promise was made by FHLBB. Rather, plaintiffs' request was embedded within its application, which FHLBB acted upon and approved during the course of carrying out its regulatory functions, which included the initial requirement of an accountant's letter as well as the submission of the accountant's letter confirming plaintiff's intentions. *See also Fifth Third*, 52 Fed.Cl. at 275. Significantly, *CalFed II* "repeatedly emphasized (1) the bargained-for aspect of the transactions in which a contract had been found and (2) the expression of the regulators' assurances in forbearance letters." *Anchor Savings Bank v. United States*, 52 Fed.Cl. 406, 420 (citing *CalFed II*, 245 F.3d at 1346–47). As stated above, this court has found neither regulators' assurances in forbearance letters in this case nor a bargained for exchange. Thus, in the view of this court, the facts of *CalFed II* are entirely distinguishable from the facts of this case.

### b. *This case is distinguishable from other COFC cases applying CalFed II wherein the court found the existence of a contract*

In *Anchor Savings Bank, FSB v. United States*, 52 Fed.Cl. 406, 411 (2002), the court found that with respect to the Peachtree and Crisp transactions the plaintiff had established the existence of a contract. The Peachtree and Crisp transactions in *Anchor* also were facilitated by assistance agreements, FHLBB resolutions and forbearance letters. *Anchor*, 52 Fed.Cl. at 414. Thus, the Peachtree and Crisp transactions at issue

in *Anchor* are wholly distinguishable from the acquisition of Empire, inasmuch as Commercial Federal's acquisition of Empire was unassisted and lacked supervisory agreements, resolutions, integration clauses, and forbearance letters.

In *LaVan, et al. v. United States*, 53 Fed. Cl. 290 (2002), the court held that special approval of the push-down method of accounting, compared to GAAP methods of accounting such as "pooling" or "purchase" accounting, supported a finding of an implied-in-fact contract. The court found that a special request to deviate from GAAP in the treatment of goodwill was critical to the agreement between FHLBB and the acquirers because this special accounting treatment was necessary to make the conversion from mutual to stock association viable, and that the facts and circumstances surrounding the approval of the conversion established a bargained for agreement. *Id.* at 298–99. Also, in *LaVan*, approval required a finding that, *inter alia*, the existing institution was or would soon become insolvent.

In the case at bar, however, Commercial Federal's use of purchase accounting in accordance with GAAP does not definitively answer the question of whether the Empire acquisition was contractual or regulatory in nature. The specific, bargained for agreement to a specific accounting treatment present in *LaVan* simply does not exist in this case.

In support of their argument that a contract exists with respect to the Empire transaction, plaintiffs also point to *Admiral Financial Corporation v. United States*, 54 Fed.Cl. 247 (Fed.Cl.2002), where the court found in favor of the plaintiff on the existence of a contract and its breach by the government. The court in *Admiral* found that the documents were not materially different from those in *CalFed. Id.* at 254. In *Admiral*, the acquired thrift (1) had been identified as a possible acquisition target for plaintiff by the regulators at the FHLBank of Atlanta; and (2) was "a failing thrift." *Id.* at 249–50. The relevant documents included correspondence between Admiral and the bank board; correspondence between Admiral and the acquired thrift; applications for

regulatory approval of the acquisition requesting forbearances; the merger agreement; the FHLBB resolution approving the merger; the RCMA executed between Admiral and the FHLBB; and the forbearance letter issued by FHLBB. The court also noted that one of the documents repeatedly referred to itself as a "binding obligation." *Id.* at 255. The court found that the merger was not merely an exercise of the FHLBB's regulatory powers, as it was conditioned on terms "reasonably satisfactory to Admiral," and that the ability to include supervisory goodwill under the agreed upon terms was the key to Admiral's bargain. *Id.* at 255–56. The court also relied upon the fact that without the forbearances Admiral would have fallen out of regulatory capital compliance upon the date of the merger. *Id.* at 256.

The facts in this case, however, are in stark contrast to the facts in *Admiral.* In the Empire transaction there was no provision in the merger conditioning it on meeting terms such as "reasonably satisfactory to Commercial Federal." As discussed *supra,* in the view of this court, the provisions present in the merger agreement in this case are not as specific as those in *Admiral*—in the case at bar the merger was conditioned on the lack of "materially burdensome" conditions, and not on the inclusion of supervisory goodwill. Also, Empire had not been marked by FHLBB for acquisition as in *Admiral.* Further, in the application in *Admiral* the forbearances were described as "material provisions of the agreement" and "key essential elements." *Id.* at 250. The application also indicated that denial of the requested forbearances could result in the withdrawal of its application. *Id.* In the case at bar, however, there is no such language in the application. Also, in *Admiral* the FHLBB issued a resolution contemplating FHLBB's utilization of the goodwill accounting treatment previously described. *Id.* at 251. And although the approval document was silent with respect to the forbearances, the FHLBB specifically incorporated these items into the resolution via a forbearance letter stating that "[f]or purposes of reporting to the Board, the value of any intangible assets resulting from the application of push-down accounting in accounting for the pur-

chase, may be amortized by Haven for a period not to exceed 25 years by the straight line method." *Id.* In the case at bar, however, no such letter exists. Also, in this case there was no FHLBB resolution.

Plaintiffs analogize the acquisition in *Admiral* to the Empire acquisition on the ground that the acquired thrift had been identified as a possible acquisition target for Admiral by the regulators at the FHLBank of Atlanta, just as the chief regulator of the FHLBank of Topeka had identified Empire as an acquisition target for Commercial Federal. Also, plaintiffs point out that they too would have fallen out of regulatory capital compliance, absent the use of supervisory goodwill. The fact remains, however, that in this case the documents simply do not establish the promissory nature of the FHLBB's approval of ComFed's application. Also, as discussed *infra,* the fact that plaintiffs would have fallen out of regulatory capital compliance absent the use of goodwill accounting does not demonstrate the existence of a contract. If it did, then deciding these *Winstar*-related cases would be as simple as making that factual determination.

Plaintiffs also analogize their case to *Sterling Savings v. United States,* 53 Fed.Cl. 599 (2002), wherein Chief Judge Damich found contracts to exist in connection with two "assisted" acquisitions and one "unassisted" acquisition of financially troubled thrifts. The unassisted transaction involved Sterling's 1988 acquisition of Central Evergreen Federal Savings and Loan Association and is similar to Commercial Federal's acquisition of Empire insofar as no forbearance letters were issued and no cash assistance was provided by FSLIC. *Sterling,* 53 Fed.Cl. at 612. Also, Sterling had to submit to the FHLBB an independent accountant letter stating that the transaction was in accordance with GAAP, just as in the case at bar. The *Sterling* court concluded that the government entered into a contract to permit Sterling to count goodwill as an asset for regulatory capital purposes and amortize it in accordance with the accountant's subsequent opinion. *Id.* at 613.

In *Sterling,* the resolution of the Bank Board clearly stated that "it intended to enter into the transaction for supervisory purposes, i.e., to prevent the probable failure of Central Evergreen." *Id.* Also, the FHLBB resolution required plaintiff to enter into a written agreement with the FSLIC, indicating that the resulting institution would operate within the scope of the business plan provided with its application, and that its terms were to be ratified by the plaintiff's board of directors. *Id.* at 606, 613. Immediately thereafter, plaintiff and the FSLIC entered into a written agreement that included the thrift's attached business plan. *Id.* at 607. That business plan, with projected goodwill, was part of the written agreement between the parties. *Id.* Most significantly, the *Sterling* court stated that "the reciprocal resolutions of the Bank Board and plaintiff's board of directors, along with the business plan contained within the agreement between FSLIC and plaintiff, are sufficient evidence of intent to enter into a bargained-for exchange between the parties." *Id.* at 613.

ComFed's purchase of Empire, however, differs greatly from the Central Evergreen transaction in *Sterling.* At the outset, Com-Fed's acquisition was not "supervisory." Actually, ComFed paid an advisory fee of $50,000 to Shearson Lehman Brothers for its assistance in identifying Empire as a possible acquisition candidate. Def.App. at 12–15. ComFed then paid $45 million to purchase Empire. As ComFed's application states, Shearson Lehman Brothers determined the $45 million to be a fair price. Def.App. at 315, 341–42. Further, in ComFed's acquisition of Empire, there was no agreement whatsoever; rather, ComFed submitted a standard nonsupervisory application for approval. There was also no FHLBB resolution, much less a reciprocal resolution between the parties. The principal supervisory agent approval letter did not even mention goodwill; instead it merely requested compliance with the regulatory requirement of an accountant's letter, indicating that the transaction was in accordance with GAAP. As required, ComFed submitted the accountant's letter, which simply stated that the utilization of the purchase method of accounting was in accordance with GAAP. Def.App.

at 116. Thus, the court finds the Empire acquisition to be distinguishable from the unassisted acquisition in the *Sterling* case.

In *Hometown Financial Co. v. United States,* 53 Fed.Cl. 326 (2002), the court found the existence of a contract and stated that there was nothing in the facts of the case to distinguish it from those facts that gave rise to the contract in *CalFed II. Id.* at 335. The court found that the forbearances and treatment of goodwill were requested from and granted by the government as part of the bargained for exchange with plaintiffs, whereby plaintiffs agreed to infuse $2,050,000 in capital into the converted institution. *Id.* at 336. The forbearance letter was referenced and affirmed in the FHLBB's final approval, and was also expressly referenced in the specific capital maintenance and dividend agreements signed by plaintiffs. *Id.* Also, each agreement stated that it "shall be deemed a contract made under and governed by Federal law." *Id.*

In the Empire acquisition, however, there was no forbearance letter ever requested or referenced throughout the attendant documentation. Thus, the factual record in the Empire acquisition simply does not support the finding of a bargained for exchange as it did in *Hometown Financial.*

Similarly, the Empire acquisition is readily distinguishable from the acquisition at issue in *Franklin Federal Savings Bank v. United States,* 53 Fed.Cl. 690 (2002). In *Franklin Federal,* the court found that the FHLBB's promise to allow Franklin Federal to amortize its supervisory goodwill over 25 years was a contractual commitment by the government. The court found "[t]here is no doubt that the dividend agreement of January 1989 . . . was a binding contract." *Id.* at 705. The dividend agreement granted the PSA authority to grant approvals, waivers or forbearances. *Id.* at 706. Further, the dividend agreement also contained an integration clause. The approval letter acknowledged the supervisory forbearance, and authorized the issuance of the forbearance letter. The forbearance letter specifically allowed a 25–year amortization period for the supervisory goodwill. *Id.* Without

this accounting forbearance, Franklin Federal would have had to amortize goodwill over "the estimated useful life of the longest live[d] assets that were purchased." *Id.* at 695. The court noted that the forbearance letter, like the approval letter, constituted a written understanding between the parties, within the meaning of the integration clause of the dividend agreement. *Id.* at 706. Thus, both the approval letter and the forbearance letter were integrated into the dividend agreement and comprised part of the contract between the parties. Also significant in this case was that the government specifically found that the supervisory conversion and acquisition were "necessary to prevent the probable failure of [Morristown]." *Id.* at 695.

By contrast, in the Empire acquisition, there was no integration clause; no acknowledgment of the supervisory forbearance in the approval letter; and no forbearance letter allowing a specific amortization period for the supervisory goodwill agreed upon between the government and the acquiring thrift. Thus, *Franklin Federal* does not support a finding of a contract with respect to the Empire acquisition.

### c. *This case is analogous to Anchor Savings Bank; First Commerce Corp.; Southtrust of Georgia; and Standard Federal Bank wherein the courts grant summary judgment in favor of defendant*

In *Anchor Savings Bank, FSB v. United States,* 52 Fed.Cl. 406, 411 (2002), the court found that in the Standard acquisition, neither the merger agreement between the acquiring thrift and the failing thrift; the merger application to FHLBB; the subsequent FHLBB approval letter; nor the initiation of the transaction by a FHLBB official, was sufficient to evince a contractual promise by the government regarding long-term amortization of goodwill resulting from the merger, in the absence of an assistance agreement with the FHLBB or a forbearance letter from the FHLBB. *Id.* at 418–20.

This court views the *Anchor* acquisition as being the most similar to the acquisition in the case at bar of any of the acquisitions in other cases involving unassisted acquisitions. The Empire transaction followed the same regulatory path as the Standard transaction. As in the Standard acquisition in *Anchor,* the Empire transaction included a merger agreement between private parties, a required application for FHLBB approval of the merger, and a PSA approval letter. In *Anchor,* as in the case at bar, "[n]othing about the [ ] transaction suggests that plaintiff was looking for a guarantee that a change in regulations generally applicable to thrifts would not apply to Anchor." *Id.* at 418. And, like the court in *Anchor,* this court does "not interpret the case law construing *Winstar*-type transactions as establishing a standard so broad as to require or permit construing the [Empire] transaction as one involving express or implied contractual assurances by the government for the long-term amortization of goodwill." *Id.* at 420.

The court in *First Commerce Corp. v. United States,* 53 Fed.Cl. 38 (2002) similarly addressed the argument that a combination of various documents created a contractual agreement and soundly rejected it. The plaintiff in *First Commerce* argued that its bid letter, merger application, FHLBB approval letter, forbearance letter and the accountant's confirmation letter should be read together to constitute a specific request for a twenty-five year amortization period in its supervisory conversion and a "meeting of the minds regarding both the regulatory treatment of the goodwill and the [twenty-five year] amortization period." *Id.* at 45 (citation omitted). The court held that First Commerce's application contained no specific request to receive a lengthened amortization period and therefore did not support a mutual intent to contract. *Id.* The application had only sought amortization using the level yield method over the lives of the related assets. Because the forbearance letter that was actually issued permitted amortization over a period of twenty-five years, the court found there was a lack of agreement between the forbearances granted in the forbearance letter and the forbearances sought by First Commerce in its application. *Id.* at 46. The court therefore denied. First Commerce's motion for summary judgment upon liability

for breach of contract and granted the government's cross-motion for summary judgment, holding that the unassisted acquisition in question was purely a regulatory undertaking and was not contractual in nature. *Id.* at 43–48.

With respect to the elements of contract formation, the court in *First Commerce* found that the application to acquire the troubled thrift could not serve as the contract "offer" because "First Commerce's application contained no specific request to receive a lengthened period for amortizing the goodwill, much less conditioned its application on receiving such amortization treatment." *Id.* at 45 (citing *CalFed II*, 245 F.3d at 1345). *See also Fifth Third*, 52 Fed.Cl. at 275 (distinguishing *CalFed* by noting that in the case under consideration there was no independent request regarding goodwill and amortization made by plaintiffs in the application). The court also was not persuaded by the fact that FHLBB required that the thrift submit an opinion by an independent public accountant indicating that the acquisition had been consummated in accordance with GAAP.[18]

As was the case in *First Commerce*, ComFed's 1986 application to acquire Empire contained no specific request or condition related to the amortization period for any goodwill resulting from the transaction. Indeed, the factual record in this case shows that neither ComFed's merger application nor the approval letter issued by the principal supervisory agent for the FHLBB provides for any specified amortization period for the goodwill resulting from the merger. Moreover, these documents also do not address whether the goodwill arising from the Empire merger could be counted by ComFed towards meeting its regulatory net worth requirements for a set period of time without assuming any risk of regulatory change. Although ComFed argues that its submission of the independent accountant's letter establishes the regulators' acceptance of its alleged offer to contract, the requirement that the thrift submit an independent accounting letter regarding the accounting for the transaction is a standard requirement for all mergers and acquisitions. *See* discussion *supra*. Thus, as in *First Commerce*, in the case at bar the Empire transaction is purely regulatory, rather than contractual in nature.

The Empire acquisition is also similar to *Southtrust of Georgia Inc., et al. v. United States*, 54 Fed.Cl. 741 (2002), in which the court granted the government's motion for summary judgment on liability. In support of its claim of a contract, plaintiff in *Southtrust* relied upon a merger agreement; a required application which listed the goodwill as being amortized over a period of twenty-five years but did not seek any waivers or supervisory forbearance; a request for additional information (in response to which plaintiff lowered its requested amortization period to ten years); an approval letter; and a RCMA. The court found that there was no contract other than in the RCMA, which actually placed the burden of change in the regulatory capital maintenance requirements on the plaintiffs. *Id.* at 746. The court ultimately concluded that "none of the indicia of a bargained for exchange in connection with goodwill exists," and that the approval of the acquisition was regulatory. *Id.* at 747.

Similarly, in the case at bar, the periods of amortization vacillated and the documentation, insofar as the court can ascertain, is similar to that in *Southtrust*. As such, the court must conclude, as did the court in *Southtrust*, that where "the acquirers expressly committed in the RCMA to meet any new regulatory capital requirements, did not secure protection of that goodwill in the event of a regulatory change, and no other agreement regarding goodwill exists, the court has no basis for finding a breach of contract following the regulatory change occasioned by FIRREA." *Id.* at 747.

In *Standard Federal Bank v. United States*, 2002 WL 31947572, No. 95–478C (Fed.Cl.2002), the court granted summary judgment in favor of the government with

---

**18.** Although the court in *First Commerce* did consider surrounding circumstances in reaching its conclusion and found them to be nonpersuasive evidence in support of a contract, for the reasons set forth *infra* this court has concluded that in the case at bar it is unnecessary to consider plaintiffs' arguments in this regard.

respect to two unassisted transactions. With respect to the Landmark transaction, the court found the transaction to be distinguishable from *Winstar* and *CalFed II* in the following respects:

> 1) the plan of merger did not request purchase method accounting; 2) there were no negotiations regarding regulatory goodwill; 3) the letter approving the merger does not mention purchase accounting or goodwill or contain an integration clause incorporating other documents; 4) the merger agreement did not call for purchase method accounting; 5) no FHLBB resolution was issued; 6) no assistance agreement was involved; 7) no forbearance agreement was issued; 8) neither Landmark nor the surviving entity ... faced insolvency absent permission to use purchase method accounting for goodwill; and 9) plaintiff had other valid business reasons for entering into this transaction, such as the potential for an increased deposit base and operating economies.

*Standard Federal,* 2002 WL 31947572 at *11.

The court also found the accountant's letter submitted with the application to be insufficient to support plaintiff's claim of a contract. *Id.* at *12.

Although, to be certain, there are distinguishing factors in the *Standard Federal* case that could be construed in Commercial Federal's favor, e.g., the merger application merely described the availability of goodwill as "probable," and there was no evidence of negotiations, this court is of the opinion that, on balance, the same overwhelming lack of evidence of mutual intent to contract exists in this case—there was no merger agreement; no FHLBB resolution was issued; there was no forbearance letter; and there was no clear agreement of any type from the FHLBB permitting the use of a specified amount of regulatory goodwill for a set period of time.

Similarly, with respect to the Peoples transaction in *Standard Federal,* the court also found it to be distinguishable from those in *Winstar* and *CalFed II* based, in sum, on the fact that "the multiple references to purchase accounting in the documents surrounding the Peoples transaction do not rise to the level of clear, bargained-for contractual

promises present in *Winstar* or *CalFed II*." *Id.* at *17. Thus, in sum, the court finds this court's opinion regarding the Empire acquisition to be not inconsistent with the court's opinion in *Standard Federal.*

> **d.** ***This case is factually distinguishable from Fifth Third, in which the court found the existence of a genuine issue of material fact as to contractual liability***

In *Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 264 (2002), the plaintiff-acquiring thrift relied upon the following evidence in support of its claim of a contract: a formal merger agreement with the troubled thrift; an application to FHLBank of Cincinnati; a letter from plaintiff's independent accountant concluding that use of the purchase method to account for the transaction was justified under GAAP; and financial statements anticipating and estimating goodwill. FHLBank of Cincinnati approved the agreement by resolution. The resolutions required, *inter alia,* that prior to consummation of the acquisition, plaintiff provide an opinion letter from its independent accountant justifying the use of the purchase method of accounting, describing any goodwill arising from the purchase, and substantiating the reasonableness and amounts of the goodwill and its amortization period. *Id.* at 267. The resolution also specifically referred to a 30–year amortization period. *Id.* at 267, n. 5. Plaintiff then submitted the financial statements and accountant's letter required by each resolution. *Id.* at 267. In addition to these communications, FHLBank of Cincinnati conducted an in-depth evaluation of the proposed transactions, conditionally approving them prior to the official approval embodied in the resolution. *Id.* at 268. These conditional approvals and evaluations were memorialized in internal FHLB–Cincinnati "digests" and recognized plaintiff's expectation to account for the transactions using the purchase method, to amortize goodwill, and to count that goodwill toward regulatory capital. *Id.*

On motion for reconsideration, the court stated that "the record in this case reveals

the real possibility that a healthy thrift would have acquired a failing thrift without being promised the regulatory accounting treatment offered to the plaintiffs in *Winstar.*" *Fifth Third Bank of Western Ohio v. United States,* 52 Fed.Cl. 637, n. 2 (2002). The court ultimately concluded that: "A trial is necessary to make factual findings regarding all the parties' communications, as well as the particular economic circumstances surrounding the transactions ... These facts are essential to determine whether the documents that have been submitted are promissory in nature." *Fifth Third,* 52 Fed.Cl. at 278.

The Empire acquisition, however, lacks a resolution specifically referring to a specified 30–year amortization period. Also, there is no conditional approval and evaluation memorialized in internal "digests" recognizing plaintiffs' expectation to account for the transactions using the purchase method, to amortize goodwill, and to count that goodwill toward regulatory capital. Thus, the documentary evidence raising the specter of a possible existence of a bargained for exchange in *Fifth Third* is absent from the Empire acquisition.

### 4. *Circumstances*

#### a. *Economic circumstances*

In additional to documentation, Commercial Federal relies on economic circumstances to establish contractual intent, citing the *Winstar* opinion and contending that it would have been "madness" for Commercial Federal to proceed with the Empire acquisition absent promises to account for the transactions using the purchase method, to amortize goodwill, and to count that goodwill toward plaintiffs' regulatory capital. The Supreme Court plurality in *Winstar* discussed at length the economic circumstances surrounding the Glendale transaction and concluded that these circumstances supported its construction of the documentary record as contractual commitments. *See Winstar,* 518 U.S. at 863–64, 116 S.Ct. at 2449. Both the Federal Circuit and the Supreme Court observed that the resulting thrift immediately would have been in noncompliance without the regulatory accounting treatment. *Winstar,* 518 U.S. at 863, 116 S.Ct. at 2449. Sig-

nificantly, however, the appropriate question is "whether each party would have engaged in the transaction absent the existence of a binding contract-insolvency is not the determinative factor." *CalFed I,* 39 Fed.Cl. at 768. As the court reiterated in *Southern National,* 54 Fed.Cl. 554, 561 (2002), the fact that a transaction may constitute "madness absent special regulatory treatment does not establish the existence of a contract promise." (citing *Winstar,* 518 U.S. at 910, 116 S.Ct. 2432; *Fifth Third,* 52 Fed.Cl. at 275; *CalFed,* 39 Fed.Cl. at 767).

Plaintiffs argue that immediately following the Empire acquisition in 1987, Commercial Federal would not have been in compliance with the FHLBB's regulatory capital requirements if it could not have included in its capital and amortize in accordance with GAAP both the $190 million of goodwill and other intangibles arising from the acquisition of Empire Savings and include in its regulatory capital the $60 million of preferred stock issued to facilitate the acquisition. In June following the transaction, the audited financial reports submitted by Commercial Federal for year-end 6/30/87 indicate that Commercial Federal's regulatory capital requirement was approximately $161.5 million and its actual regulatory net worth—including both the goodwill and other intangibles and the preferred stock relating to the Empire transaction-was approximately $219 million. Pl. Mot. at 19 (citing Pl.Ex. H at 39). Without goodwill, Commercial Federal would have had negative regulatory capital resulting in Commercial Federal immediately falling into regulatory noncompliance.

As discussed at length *supra,* the government counters Commercial Federal's financial circumstances argument by contending that Commercial Federal acquired the thrift as part of a business plan to enter Colorado as part of its expansion plan. Thus, the government suggests that Commercial Federal would have entered into the transaction with Empire regardless of any forbearance and amortization of goodwill. Also, the parties disagree on the financial condition of Empire. Although they agree that Empire was not listed on any "troubled" or insolvent thrift list of the FSLIC or the FHLBB,

plaintiffs contends that Empire was in a "troubled financial condition" whereas the government contends that Empire was not a "sick" or "troubled" thrift. The government does, however, fall short of stating that Empire was a "healthy" thrift. Plaintiffs contend that the question of Empire's troubled financial condition is relevant to the consideration exchanged by the parties.

Although the court does find that there are factual issues regarding the financial health of Empire, the court finds these largely irrelevant. This is so because even assuming that Empire was a moderately unhealthy to troubled thrift, there is still an utter lack of evidence to establish intent to contract on the part of the FHLBB. As such, in the view of this court there is no genuine issue of material fact as to the financial health of Empire to preclude summary judgment, because even if this court were to find after a trial that Empire was in poor health it would not affect the outcome of this suit. An issue is material if it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (stating that a fact is material if it would affect the outcome of the suit). It is entirely possible that plaintiffs may have had other business reasons for wishing to proceed with this transaction even in the absence of a contractual commitment to use the purchase method, to amortize goodwill, and to count that goodwill toward plaintiffs' regulatory capital. Although, as previously stated, the court does not doubt that plaintiffs intended to account for the transactions using the purchase method, to amortize goodwill, and to count that goodwill toward plaintiffs' regulatory capital, the record in this matter is totally devoid of any evidence of (1) intent of plaintiffs to seek or secure any protection for the use of that goodwill for any period of years; and (2) intent on the part of FHLBB to bargain for and contract to this accounting. In sum, this court finds that where there has been no offer and acceptance, it is unnecessary to proceed to the question of consideration, because there can be no contract absent offer and acceptance. *See Winstar,* 518 U.S. at 871, 116 S.Ct. at 2453; *CalFed II,* 245 F.3d at 1346 (quoting *Massie v. United States,* 166 F.3d 1184, 1188

(Fed.Cir.1999) (citation omitted)) (stating that "any agreement can be a contract within the meaning of the Tucker Act, provided that it meets the requirements for a contract with the Government, specifically: mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government"). *See also Home Savings of America v. United States,* 50 Fed.Cl. 427, 435 (Fed.Cl.2001) (noting that economic circumstances are not a substitute for an actual promise, but, rather, assist in resolving ambiguity whether the FHLBB resolution in that case was a contractual commitment).

#### b. *Negotiations*

In support of their claim of the existence of a contract to account for the transactions using the purchase method, to amortize goodwill, and to count that goodwill toward regulatory capital, plaintiffs also rely upon alleged negotiations that transpired between the parties. Other cases have found negotiations to be relevant when considered with the pertinent documentary evidence. For example, in *Winstar II,* the Federal Circuit stated that its conclusion was supported not only by documentary evidence but also "by other evidence and by the circumstances surrounding the transaction." *Winstar II,* 64 F.3d at 1542. Specifically, the court noted the parties' intent to use supervisory goodwill for regulatory capital purposes was demonstrated by "the extensive negotiations and the conditions regarding its use." *Id. See also CalFed II,* 245 F.3d at 1347. Also, in *Admiral* the court stated that the "history of negotiations may sometimes be looked at to determine contractual intent ... [b]ut in the end it is only a guidepost." *Admiral,* 54 Fed.Cl. at 255. Specifically, in this case plaintiffs allege:

(1) ComFed was encouraged by officials from the FHLBank of Topeka to assist them with the acquisition of financially-troubled or failing thrifts. According to plaintiffs, Mr. Mowbray specifically suggested that Commercial Federal consider Empire Savings in Colorado, which Mr. Mowbray stated he knew to be looking for a merger partner.

(2) Plaintiffs also allege that there were negotiations following its submission of its application to acquire Empire, in which the government clearly manifested its understanding that its agreement to regulatory capital treatments for the goodwill and other intangibles arising under purchase method accounting, as proposed in the application, was necessary in order for the acquisition of Empire to be financially feasible and for Commercial Federal to remain in regulatory capital compliance after the acquisition.

(3) Plaintiffs also allege that during the period prior to the closing of the Empire acquisition, Commercial Federal's CEO inquired of Kermit Mowbray whether Commercial Federal might revise its proposed acquisition and receive financial assistance from the FSLIC. According to plaintiffs, Mr. Mowbray strongly encouraged Commercial Federal to continue with the transaction and specifically acknowledged that the "consideration" that Commercial Federal would receive for the acquisition would be the favorable accounting treatment for the "goodwill" that arose from the transaction.

Significantly, the only documentation in the record supporting ComFed's account of these negotiations is the Fitzgerald affidavit.

In the view of this court, although there are certainly factual issues regarding the negotiations and genesis of the idea for the acquisition, even if this court were to hold a trial and find plaintiffs' assertions numbered (1)—(3) above as true, the fact remains that there is an overwhelming lack of evidence in this matter to establish the existence of *intent to contract* for plaintiffs' use of the purchase method, to amortize goodwill, and to count that goodwill toward regulatory capital. The court is aware of no *Winstar*-type case where the negotiations and circumstances surrounding the acquisition were sufficient to establish intent to contract even in the absence of adequate documentary evidence. Accordingly, the court finds that these factual questions are not genuine issues of material fact that would contribute meaningfully to the resolution of this dispute, and as such their existence does not preclude the grant of summary judgment on liability with respect to the Empire acquisition in favor of the government. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 (stating that a fact is material if it would affect the outcome of the suit). This court believes this decision to be entirely consistent with *CalFed II* and *Winstar III*. Although the Supreme Court and Federal Circuit did consider negotiations in those cases, in the view of this court the negotiations and surrounding circumstances *colored* those courts' findings of contract when considered with extensive documentary evidence establishing the existence of contracts. Although the plaintiffs in this case have repeatedly argued that *CalFed II* stands for a departure from requiring rigid, formulaic, contract documents, this court is not of the opinion that the Federal Circuit intended the Court of Federal Claims to depart entirely from the functional requisites of a contract such as mutual intent, offer, acceptance, and consideration. *See* discussion of contract requirements *supra*.

### c. Other cases denying summary judgment

This court is aware that other judges have found it necessary to hold trials on issues regarding either economic circumstances, negotiations, or both. For example, in *Southern National Corp. v. United States*, 54 Fed. Cl. 554 (2002), the court found that the parties' dispute over First Federal's economic circumstances at the time of the mergers, as well as over the parties' intentions in connection with the acquisitions created a genuine issue of material fact precluding summary judgment. As in *Fifth Third*, "[t]he court deem[ed] this contextual evidence particularly relevant where the only communications between the parties occur during a process of regulatory approval." *Southern National*, 54 Fed.Cl. at 561 (citing *Fifth Third*, 52 Fed.Cl. at 275).

Similarly, in *Advance Bank v. United States*, 52 Fed.Cl. 286 (2002), the court found the existence of genuine issues of material fact as to the existence of a contract between the thrift and the government. The court

was unpersuaded by the "conclusory and unilateral affidavit [of the thrift's president] stating that the merging parties understood that the government offered and agreed to the contended-for treatment of goodwill." *Id.* at 290, 291. The court found questions existed as to whether the government played a substantive role in arranging the merger; whether the government used the specified treatment of goodwill as an inducement for the merger; and whether any negotiations regarding the specified accounting treatment took place. *Id.* at 291. *See also First Federal Lincoln Bank v. United States,* 54 Fed.Cl. 446, 458–59 (2002) (finding that because the "surrounding circumstances" evidence was in dispute and there were genuine issues of material fact regarding the parties' mutual intent to contract, it was necessary to proceed to trial).

In those cases, the individual judges deemed the respective factual circumstances warranted a trial, since in the view of those courts, there was enough ambiguity regarding the alleged contractual documents that a trial was necessary to ascertain intent to contract, and it was necessary to examine negotiations and/or economic circumstances. In the case at bar, however, as discussed at length *supra,* this court has found no evidence whatsoever of a mutual intent to contract. Specifically, the court has found no offer and no acceptance. In the face of this evidence, the court deems it unnecessary to proceed to trial with respect to the Empire acquisition. The court declines to read *CalFed II* as establishing a standard so broad as to require or permit construing the Empire acquisition as one involving express or implied contractual assurances by the government for the use of the purchase method, to amortize goodwill, and to count that goodwill toward regulatory capital. As such, the plaintiffs' motion for summary judgment is denied with respect to liability in the Empire acquisition, and the government's cross-motion for summary judgment is granted in part, with respect to liability in the Empire acquisition.

### E. *Territory acquisition*

 The Territory transaction is relatively straightforward, and contains strong evidence of mutual intent to contract. In sum, Commercial Federal submitted a "bid" that was accepted by the government, and one term of Commercial Federal's accepted bid was a regulatory capital credit.

Specifically, in response to the FHLBB's solicitation of bids for the savings deposits of Territory, a seriously insolvent thrift, Commercial Federal submitted a bid on January 22, 1988 to acquire from the FSLIC the insured deposits of Territory as well as certain of its real and personal property at a "discount." In the first of two alternative bids, ComFed *offered, inter alia,* to accept a five-year promissory note from the FSLIC for $20 million as part of the FSLIC's payment for Commercial Federal's assumption for the savings deposits of Territory. The bid letter also specified "in addition, Commercial Federal is asking that the FSLIC consider the five-year note . . . as regulatory net worth for purposes of reporting to the FHLBB." Def.App. at 131–32. This bid was *accepted* by FHLBB in a formal resolution dated January 28, 1988 and FHLBB then transferred the accounts of Territory's insured savings depositors to Commercial Federal. Significantly, as a part of the transaction, FHLBB authorized FSLIC to issue the $20 million note to Commercial Federal via a formal resolution, and authorized and directed its Secretary to send a letter to Commercial Federal concerning the regulatory capital treatment of that note. Pl.Ex. Q at 3. The forbearance letter was issued on February 1, 1988, by FHLBB Secretary John M. Buckley and states, in part:

> It is the FSLIC's intention that the Five-Year Promissory Note to be issued to Commercial [Federal] pursuant to a Transfer Agreement to be entered into between the FSLIC and Commercial is to be credited to Commercial's regulatory capital for purposes of reporting to the Board; therefore, for regulatory accounting purposes, Commercial may book such promissory note as a direct addition to its regulatory capital.

Pl.Ex. T.

The court disagrees entirely with the government's position that this forbearance is

not a contract because all the elements of contract formation have not been satisfied. This court finds that there was an *offer* in plaintiffs' bid letter to accept a five-year promissory note from the FSLIC for $20 million as part of the FSLIC's payment for Commercial Federal's assumption for the savings deposits of Territory and request for the five-year note to count as regulatory net worth for purposes of reporting to the FHLBB. The court finds that this offer was *accepted* by FHLBB in a formal resolution dated January 28, 1988. As further evidence of the parties' mutual intent to contract, ComFed did receive a forbearance from FHLBB, permitting it to count the $20 million promissory note toward regulatory capital. Thus, in the view of this court there was a clear agreement whereby Commercial Federal offered to accept a five-year, $20 million promissory note from the FSLIC, which could be booked as a direct addition to ComFed's regulatory capital, as part of the FSLIC's payment for Commercial Federal's assumption of Territory's savings deposits. In reaching this conclusion, the court squarely rejects the government's argument that the court should not find a contract in the absence of an integration clause. *See, e.g., CalFed II*, 245 F.3d at 1347.

In reaching this conclusion, the court also relies on the fact that this undertaking was certainly not merely regulatory in nature, as evidenced by virtue of the fact that FHLBB solicited bids for the savings deposits of Territory, a seriously insolvent thrift that was ultimately placed into federal receivership. Thus, the court grants plaintiffs' motion for summary judgment with respect to liability in the Territory acquisition, and denies the government's cross-motion for summary judgment with respect to liability in the Territory acquisition.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** as follows:

(1) Plaintiffs' motion for summary judgment filed on March 25, 1998 is **DENIED** insofar as it seeks to establish liability for breach of contract with respect to its 1987 acquisition of Empire Savings, Building and Loan Association, of Denver, Colorado;

(2) Plaintiffs' motion for summary judgment filed on March 25, 1998 is **GRANTED** insofar as it seeks to establish liability for breach of contract with respect to its 1988 acquisition of the savings deposits of Territory Savings and Loan Association of Seminole, Oklahoma;

(3) Correspondingly, defendant's cross-motion for summary judgment filed on September 14, 1999 is **GRANTED** insofar as it seeks to establish no liability for breach of contract with respect to Commercial Federal's 1987 acquisition of Empire Savings, Building and Loan Association, of Denver, Colorado;

(4) Defendant's cross-motion for summary judgment filed on September 14, 1999 is **DENIED** insofar as it seeks to establish no liability for breach of contract with respect to Commercial Federal's 1988 acquisition of Territory Savings and Loan Association of Seminole, Oklahoma;

(5) Entry of judgment in favor of defendant concerning the Empire acquisition shall be **WITHHELD** pending further order; and

(6) The parties shall **FILE** by or before April 14, 2003, a **Joint Status Report** including recommendations on how this case should proceed.